[No. 23846.   Department Two.   October 24, 1932.]

STEPHANIA LOHSE, *Appellant*, v. SPOKANE & EASTERN
TRUST COMPANY, *as Executor, et al.,*
*Respondents.*[1]

P. C. *Shine* and P. C. *Shine, Jr.,* for appellant.
*Brown & Weller* and E. H. *Belden,* for respondents.

HOLCOMB, J.—This action was brought by appellant
to compel the specific performance of an alleged con-
tract made by John W. Simpson, deceased, to devise
and bequeath to her all his property upon his death.

Appellant alleged in her complaint and introduced
evidence attempting to prove that, in the early part of

[1]Reported in 15 P. (2d) 271.

1929, John W. Simpson made a proposition to her that, if she would continue to take care of him as she had in the past, permit him to come to her home more often to play cards, and would visit him when he was sick, he would make her the sole beneficiary in his will; that she accepted this proposition, and performed all such services up to the time of his death, but that Simpson failed to execute such will. Appellant therefore asks that the entire property be set over to her in specific performance of the contract.

Respondents denied generally the allegations of the complaint, and after a trial to the court without a jury, the court rendered its oral opinion deciding in favor of respondents, and made findings, conclusions and judgment accordingly. This appeal results.

Simpson and his wife were pioneers in the Palouse country, this state, but moved to Spokane many years prior to this action, continuing their residence there until Mrs. Simpson's death in January, 1927. They had no children, and about 1901 took a baby boy into their home, naming him Joe H. Simpson. He was never adopted, but was raised by them as their own son, and after the death of Mrs. Simpson, he continued to live with John W. Simpson at the family home, where they did their own house work. The only extended absence of Joe from the Simpson household was during the summer of 1929, when he was employed on a farm in the southern part of Spokane county for several months, coming home on Sundays.

The Simpsons had accumulated a comfortable fortune amounting to about seventy thousand dollars, and John W. Simpson, on his death, left all the property to Joe Simpson by will, save small legacies to his brother and to the brother and sister of Mrs. Simpson.

Appellant, whose husband had died in May, 1928, became acquainted with John W. Simpson in July or

August, 1928. Thereafter, the acquaintance progressed so that Mr. Simpson taught appellant to play pinochle, and was frequently at her home for meals and to spend the evening playing cards. The frequency of these visits is a much disputed matter of evidence.

■ One assignment of error by appellant is that the trial court improperly admitted in evidence the purported last will and testament of John W. Simpson, which bears date October 11, 1930, three days before his death; and also erred in admitting in evidence statements claimed by respondents'·witnesses to have been made by deceased that he would leave his property to Joe H. Simpson. Many witnesses were permitted to testify, over appellant's objections, to what deceased had said in the latter connection. Appellant asserts that ''deceased, having entered into a binding contract, had absolutely no right to make any of the statements or the will that respondents introduced.''

It is manifest that the assumption of the existence of such ''binding contract'' assumes the very matter in issue, which was denied by respondents, and as to which the evidence is clearly conflicting. As to the introduction of the will, where an oral contract is alleged for the testamentary disposition of property, and is denied, the subsequent execution of a will which is inconsistent with the terms of the alleged contract is entitled to consideration as tending to show the improbability of such contract having been made. *Eidinger v. Mamlock,* 138 Wash. 276, 244 Pac. 684. Hence, these contentions are untenable.

Another error claimed by appellant is in requiring appellant to furnish respondents the names of her witnesses. No prejudice is shown thereby; and such an order, if erroneous, cannot be considered prejudicial.

Eighteen other errors are claimed by appellant, going generally to the findings and conclusions made by the court, and to the findings and conclusions submitted by appellant and rejected by the court.

The principal issue to be determined is whether or not the contract alleged by appellant was, in fact, made by decedent. The making of the contract and its nature was testified to principally by Rose Lanthaler, a daughter of appellant, who resided with her; appellant, of course, being disqualified from testifying under our statute.

The substance of the direct testimony of the daughter is:

"Appellant is her mother. She knew John W. Simpson in his life time. She became acquainted with him first on a visit to his house, in August, 1928. She saw him afterwards at his house and at their house, on an average of five or six times a week. He would come there about twelve (noon) and stay until about two in the morning, most of the time. He played cards there in the evening and visited. Joe Simpson called for him there when he wasn't able to drive his car after he had his second stroke. She saw her mother at Simpson's home. When he was sick her mother would go over there. She saw her mother over there many times; she would visit with him. Her mother would make an eggnog once in a while. She saw her mother cut his hair, give him a bath, shampoo his hair and do everything in her power for him. She cooked for him, gave him all his meals when he was at their house. He would eat there about three times a day. At noon time he would come when we were eating and join us; and then he would have the evening meal with us and always a lunch at night before he went home. He ate very, very heavy. He was an old man then; I think, 76.

"I saw my mother give him vibrator treatments. She took him to one doctor and a masseur. These acts commenced shortly after she met him and continued almost daily. I was living at my mother's home. My

mother sewed for him, made him night-shirts, and mended his top shirts. She pressed his clothes, washed his face and hands and gave him his bath. She played cards with him; she permitted him to come to the house every day; and looked after his general health. When he was sick at times, when he was stricken and was ill, she would bring him soup over to his house when he wasn't able to come to our house and puddings and eggnogs. She would assist him personally in regard to his person. I went on automobile trips with him and mother very frequently, mostly in our car. I went in his car a few times. Mother supplied the gas in our car. He had paralytic strokes, first, in January, or February, 1930, and another in May. He had the first stroke in our home. His right arm went paralyzed and she took his coat off and rubbed and massaged it. I was not present when he got this stroke. I saw him more or less paralyzed during May. He was more or less paralyzed up until he had the last stroke in October. I saw him the Sunday before he died.

"I heard the conversation between them in January, 1929, in the presence of Carl Ohliger, mother and myself. The substance of that conversation was, he told mother 'if she would continue her services to him as she had in the past that he was going to give her everything, and he asked her if she would, and she accepted him;' he said, to the end of his life. He said he had no one in the world that cared for him or took any interest in him at all or cared whether he lived or died, but her. He said he wanted her to have everything, that he was going to make another will. He had a will and he was going to destroy it. He made a will in Joe's favor which he said he wanted to destroy and later said he did destroy that will. The general trend of the conversation that evening was if she would continue to cut his hair, take good care of him like she had in the past, continue bathing him and watching over him as she had, he wanted her to have everything, he had no one else to care for him. He wanted mother to have everything. He was getting old and he felt he could do just as he pleased with his money and he

was going to give it to her. She said, 'I will continue to give you the services that you request,' and that she would do all she could for him.

"At that time he spoke of Joe and said he didn't want to leave Joe anything, that Joe wasn't good to him and didn't care if he lived or not; didn't take any interest in him. He repeatedly mentioned the contract and said he was going to give her everything when he died. He spoke of the will he had made in favor of Joe very often and said he was going to destroy it and make another one. In the summer of 1930, he said he had destroyed the will. I heard Joe swear at John W. Simpson and call him a name.

"Subsequent to January, 1929, I heard John W. Simpson express his feeling towards Mrs. Lohse (appellant). He said she was all he had in the world, that if she would continue her services he wanted her to have everything and said he was satisfied and contented with the way she was acting and treating him. I saw John W. Simpson first during his last illness the Sunday he lived. I took mother over there a couple of days before that on Friday. Mr. Anderson and Joe met us at the door. Mr. Simpson was in bed up in his bedroom. We wanted to go up and see Mr. Simpson and they did not want us to. They told us not to go up. They said Mr. Simpson was too sick. Mother went up first and then I came up later. John W. Simpson's condition was very poorly, he couldn't talk very well."

Carl Ohliger, the man mentioned by the daughter as having been present on that occasion, although apparently living in Spokane and process was issued for his attendance, did not appear and testify on behalf of appellant. Counsel for appellant unsuccessfully attempted to show, by examination of one of the attorneys for respondents, that he had something to do with persuading, or intimidating, this witness not to attend the trial. Some other witnesses were produced, chiefly more or less interested witnesses, who gave some testimony as to statements made by John W. Simpson,

after the alleged contract was made by him with appellant, as to his intention to give her all his property.

We have adopted the rule that such contracts can be made and proven by parol *(Velikanje v. Dickman,* 98 Wash. 584, 168 Pac. 465; *Alexander v. Lewes,* 104 Wash. 32, 175 Pac. 572), but at the same time we have just as positively declared that the contracts must be proven by evidence that is certain and convincing and in some cases have gone to the extent of saying, "beyond any reasonable doubt." *Henry v. Henry,* 138 Wash. 284, 244 Pac. 686. We think a better statement is, that actions of this character must be sustained by testimony which is conclusive, definite and certain and beyond all controversy. *Frederick v. Michaelson,* 138 Wash. 55, 244 Pac. 119. We have also almost invariably said that every case is to be determined upon its own facts and circumstances.

The trial judge very ably summed up the facts and his conclusions from them, in a memorandum opinion with which, after careful consideration of the abstract of record, we fully agree and here set out the material portion:

"This alleged contract is dependent for its establishment almost wholly upon the testimony of the daughter of Mrs. Lohse. Unless a contract as she testified to it was made, then we have. no evidence of a contract. We have certain testimony tending to corroborate her testimony, and introduced for the purpose of corroborating it as to the existence of the contract, but the terms of the contract are dependent for their proof upon her testimony.

"Now, the complaint, in stating the terms of this agreement, has nothing to say about affection or of any agreement on the part of Mrs. Lohse to do anything other than to perform physical services for Mr. Simpson. It is stated that in August, 1928, she commenced to perform services for him; that he had been living alone since his wife's death in a large frame house, had

neglected his personal appearance, was unshaven for many weeks, was unkempt in his appearance; that the plaintiff shaved him, cut his hair, cooked his meals for him, mended his clothes, made his night shirts, and acted generally for his welfare; that he ate ravenously and was niggardly in his money expenditures; that in January, 1929, several months after the plaintiff stated she had been performing these several services, he then made a contract with her that if she would continue to perform the services theretofore performed, and in addition would attend to him when called, would permit him to come to her home oftener and play cards there, would visit him when sick, and so forth, that he would give her all the property, and that she accepted the proposition.

"Now, Rose Lanthaler, in her testimony, said that Mr. Simpson ate at their house three times a day; that he came about noon and remained until late at night; that her mother cut his hair, sewed for him, cooked for him, bathed him, played cards with him, entertained him, made egg-nogs for him, took him on automobile trips and paid the expenses and supplied the gasoline, and so forth. She further testified that Mr. Simpson was there about five or six times a week.

"Now, of course, the testimony that Mr. Simpson was there as frequently as she testified to cannot be accepted. The overwhelming preponderance is against that testimony. It is very evident that he couldn't have been there with any such frequency as she testified to. I think it is conclusively established that he was there nothing like five or six times a week and nothing like two or three times a week regularly and on the average. He couldn't have been at the Odd Fellows' Temple three times a week, made trips and taken dinners at the homes of other friends as frequently as they have testified to here, gone to his ranch and to friends in the country, and so forth, as frequently as the testimony shows without contradiction, and still have been at the home of Mrs. Lohse as frequently as Rose stated, or anything like as frequently.

"It was also quite conclusively shown that he didn't eat three times a day there at the home. He may have done it on an occasion or so, but it is clear that he was

elsewhere at the times that she stated he was at her mother's home. According to her testimony he came there about noon and remained until late at night—I think it was testified, one or two o'clock in the morning. There is a good deal of doubt upon that fact because Mrs. Hupe testified that her stepdaughter would come home not later than eleven o'clock, and although she didn't know who brought her, the testimony is that Mr. Simpson brought her at least on some of the occasions, and a good many occasions probably. And the testimony of the plaintiff is that Mr. Simpson did not come back to their house after he had taken this young girl home. So, then, Mr. Simpson couldn't have been at the home at the late hours it has been testified to.

"These cases in which it is sought to establish a contract to make a will in consideration of personal services have to do with cases in which the decedent is in a condition or in circumstances—age or something—which makes it necessary to have the personal care of some one. That undoubtedly was true in the *Steinbrenner* case. And it seems to me that it is to be contemplated that that must be true in practically all the cases where, either by reason of age, infirmity, condition of health or circumstances, it is necessary that somebody should have given personal care to the decedent. Then it cannot be said that there is a consideration that would not be held to be important or valuable, sufficiently so to justify the belief that there was a contract to convey the estate, or a substantial part of it, to the person claiming to have performed those services and to be the beneficiary of such contract.

"We have here, then, an able-bodied man—I am frank to say by way of diversion that after Rose had testified and after her mother had testified, I got the impression that Mr. Simpson was in a very low state of health; that he was an invalid; that he was lying awake at night by reason of his sleeplessness and his suffering, and was glad to have a place to go to spend the evenings and have somebody to entertain him, because when he went home and went to bed he couldn't sleep. I thought that was the situation. But that does not seem to have been the situation. Mr. Simpson was not an invalid. He was not a decrepit, senile old man; he

55

was a man in the vigor of health. He had this malady, of course, but it didn't interfere with his activity to any extent apparently. He came and went, he took long drives, he made trips of various sorts, he drove his own car, he went to the homes of his friends, and he ate with them the food they cooked there. He didn't have to have special dishes at their places. None of the witnesses indicated that he didn't eat the same things. Some of them testified positively that he did eat exactly the same things they ate. So that the necessity for special dishes and for eggnogs for this strong, able-bodied man doesn't seem quite proper.

"There was no necessity for nursing him, no necessity for bathing him, no necessity for barbering him, no necessity for doing any of the things which Mrs. Lohse claims to have done. He went to the barber's once a month, which would perhaps be something along the line of a farmer's habits of life. He would figure if he had his hair cut once a month, that was often enough. He shaved himself; he had bathing arrangements at home and bathed himself; innumerable people testified that he kept himself clean. There was nothing in the way of corroboration as to any unpleasant or repulsive odor about his body. So that Mrs. Lohse was not called upon to do these things that she claims to have done in consideration of receiving this property.

"And it is unreasonable for a court to believe that this man, strong-willed, thrifty, accustomed to dealing with men in a large way, taking care of his own affairs, doing his own banking, consulting the bankers but following his own judgment, buying property and driving thrifty and perhaps hard bargains, would make such an agreement. It doesn't seem reasonable to believe that, after having striven and accumulated all his life, he would then enter into an agreement to leave all of his estate to this lady in return for these rather unsubstantial services, even if they had continued for years.

"He played cards at her house; he ate at her house. He did the same things at many other houses. He rode in her car with her. He did the same thing with many other friends. He wasn't at her house with any such

frequency as has been testified to. He wasn't in any way dependent upon Mrs. Lohse or anybody in dressing him, or in any other way. These services that have been testified to were friendly services performed for a man who was a widower. It was a pleasing thing to perform them, but I think that Mrs. Lohse couldn't have contemplated that she was to receive any such compensation for those services as is claimed here.

"I think it is true that the testimony as to statements made by Mr. Simpson relative to what he intended to do with the property have no relevancy, except as to what his intent was and whether he did really intend to make this will. They do not, as I see, and cannot be deemed to be proper or competent by way of rebuttal of the testimony as to this contract. But they do have a bearing upon the matter of the will, having a tendency to show that the will represents his real intent and purpose, and that it is to be taken for a true mark and evidence of what his desires were in the matter of his property.

"It is quite clear that he desired Joe to have the property. The first will was in his favor, and the second will was in his favor, and he must have known that he was at the point of death and that it was necessary for him to make any change that he desired to make promptly. And he made the changes, having in mind securing the property more certainly in the possession of Joe. I don't think the testimony establishes that there was a real enmity between Mr. Simpson and Joe. They dwelt together for a long period of time. There was no reason why he should have allowed Joe to remain in the home if he didn't want him there. They were together a good deal at various places; they dined together with friends; Joe drove him to the place and called for him; and in many ways the relationship was that of father and son. I doubt if any father and son always get along together in perfect harmony. There are disagreements. It is true that Joe was somewhat of a disappointment; that he didn't do all the things Mr. Simpson thought he ought to do; that he didn't accomplish what a man full grown might be expected to accomplish. But I have no doubt that he took into

consideration Joe's mental caliber and was satisfied to treat him as his son and to have him inherit his property. It is not quite reasonable to me to believe that he would desire absolutely to cut this boy out without anything and leave all of his property to a lady who, up until about two years before, had been an absolute stranger to him, and between whom and himself there apparently was not any real relationship of affection. There is no allegation in the complaint that there was any affection, and while it is said that he asked her to marry him and she declined, it would not impress me that that fact would be influential with him in leaving her his property. If he asked her and she declined, I don't think he would feel particularly pleased or desirous of having her become beneficiary of everything he had.

"Now, Mr. Simpson's illness, so far as I remember the testimony, was in January. At that time he had a partial stroke at the home of Mrs. Lohse, but later went to his own home. Whether any one went with him I cannot say, but anyhow, he went to his own home that evening, and within a short time—in about a week—he recovered, and he did not require any nursing on her part. She may have given him some attention while he was there, but any hostess would do that. Anybody who was human would do that. The nursing which Mrs. Lohse gave to this man was inconsiderable. I don't accept at all as true the story about these baths. The story is not credible that this man, when he came to her house, was in such a state that she would have to take him out and bathe him. That is discredited by numerous other refined people who testified that he came to their homes and was their guest, and that he was welcome there, and came repeatedly. Surely a man in the condition depicted by Mrs. Lohse and her daughter would not have been a welcome guest at any of these homes. People might have liked him but they wouldn't have wanted him around if that was his condition.

"Then, there is the situation as to the equity of this matter. I can't think that any court of equity could consider that for the services which it is claimed Mrs. Lohse contracted and agreed to perform, it would be

equitable or just or conscionable to give her a decree of specific performance for the conveyance of all of this estate. It seems to me it would be quite the contrary of equitable, and I think no court would defend such a decree.

"The judgment will be for the defendants."·

It is obvious that the trial judge discredited a large part of the testimony of the daughter and other witnesses for appellant. In such a case it was of peculiar benefit to the trier of the facts to see and judge of the credibility of the witnesses.

It is also obvious from the trial judge's analysis of the evidence that this case is not within the rule of cases relied upon by appellant: *Velikanje v. Dickman, supra; Alexander v. Lewes, supra; Olsen v. Hoag,* 128 Wash. 8, 221 Pac. 984; *Perkins v. Allen,* 133 Wash. 455, 234 Pac. 25; *Avenetti v. Brown,* 158 Wash. 517, 291 Pac. 469. In all those cases, the contract was proven with definiteness and convincing certainty. Here, it is not. This case therefore falls within the rule of the decisions in *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631; *Frederick v. Michaelson, supra; Eidinger v. Mamlock, supra;* and *Henry v. Henry, supra.*

The judgment is affirmed.

TOLMAN, C. J., BEALS, MILLARD, and MAIN, JJ., concur.