[No. 27355. Department One. March 6, 1939.]

GINA OSTERHOUT, *Respondent,* v. PAULINE PETERSON,
*as Administratrix, et al., Appellants.*[1]

*Harold A. Seering, Sweeney & Haugland,* and *B. H.
Camperson,* for appellants.

*Henry W. Parrott (Marion Garland,* of counsel), for
respondent.

JEFFERS, J.—This action was instituted by Gina
Osterhout against the administratrix of the estate of
Minnie Fowler, deceased, and the heirs of the de-
cedent, to compel specific performance of an alleged
oral contract, wherein it is claimed the deceased
agreed to convey to plaintiff all things in and described
in a safety deposit box as of the date of death of de-
ceased.

A trial was had to the court, and thereafter judgment

[1] Reported in 87 P. (2d) 987.

was entered for plaintiff, decreeing specific performance of the oral contract and imposing a trust upon all the estate of Minnie Fowler, deceased, both real and personal, or mixed. This appeal is from the judgment entered.

The complaint alleges:

"That many years prior to the death of decedent, to-wit: January, 1933, plaintiff and decedent entered into an oral agreement under and by the terms of which plaintiff was to do things for decedent hereinbefore and hereinafter alleged and agreed to continue said service as long as decedent should live and agreed to attend to all funeral arrangements of said decedent and agreed to attend to the cremation of decedent and bury the ashes of decedent on Orcas Island, Washington, all of which said acts and things plaintiff has fully performed, and all of which said things have been done and carried out for a period of seven or eight years. . . .

"That in consideration of the things done and performed and to be done and performed by plaintiff for decedent, and which plaintiff bound and obligated herself to do for decedent the said decedent orally agreed that she would compensate plaintiff by turning over to plaintiff as of the date of the death of decedent of all things in and described in a safety deposit box at the said Seattle Safety Deposit Vaults, said deposit vaults being now known as Guardian Safety Deposit Vaults."

Minnie Fowler died intestate in Seattle, Washington, June 30, 1937, leaving surviving her as her only heirs a brother, G. E. Strand, of Bozeman, Montana, a sister, Pauline Peterson, of Seattle, a nephew, and six nieces, children of a deceased sister. On the day of Miss Fowler's death, respondent petitioned the court to be appointed special administratrix of Miss Fowler's estate, and alleged in her petition that decedent and petitioner had, for many years, a joint safety deposit box in the city of Seattle, to which petitioner and

decedent had keys of access, and it was necessary that the effects and property of decedent be assembled, cared for, and protected, pending the appointment of a general administrator, or pending the probate of any will of decedent; that petitioner believed that decedent left a will, although petitioner had been unable to find any up to that time. Respondent was appointed special administratrix, but subsequently, Pauline Peterson, a sister of deceased, was appointed general administratrix, and thereafter the court required respondent to turn over to the general administratrix all the property coming into her hands as special administratrix.

The inventory filed in this estate shows property of the value of about thirty thousand dollars. The real estate was appraised at something over twenty-three thousand dollars. Deeds to the real estate and much of the personal property were in the joint safety deposit box.

Respondent introduced fourteen witnesses, and appellant nine, and we have summarized this testimony, in so far as we believe it touches the question before us.

Minnie Fowler and respondent had known each other for many years, and had been very close friends. Deceased operated the Seattle Safety Deposit Vaults, in the Hoge building, from about 1925, to October 1, 1936, at which time she sold out to Mr. and Mrs. Ward, who testified for respondent. Deceased was a vigorous and active woman, and with the exception of a sickness in 1933, when she was ill at respondent's home, and another time in 1937, seems to have been in good health and able at all times to conduct her own affairs. On the two occasions above mentioned, deceased was taken care of and nursed by respondent in her home.

Mrs. Fowler's husband died in 1933, and after his death, as before, she maintained her own home, except when she and her sister, Mrs. Peterson, had an apart-

ment together, and for a short time when she lived at the Palace hotel.

From about 1929, respondent and deceased seemed to have become more closely associated. Respondent would sometimes bring deceased down to work, and on many occasions came after her and took her home. Respondent would at times bring a lunch down to deceased at the vault, or would go down and they would go out together. She would take deceased to visit her properties at Enumclaw, Orcas Island, and other places, in respondent's car. Deceased would usually go out and have Sunday dinner at respondent's, and sometimes respondent would go down and help Mrs. Fowler in the vaults, although witness Isabelle D. Fix testified that respondent seemed to be at the vault more for companionship than work.

Several of respondent's witnesses testified that, when deceased would introduce respondent to strangers, she would refer to her as "my daughter." These witnesses also testified that when talking to them, Mrs. Fowler would use such expressions as: "When I die everything will go to Gina." "Gina was like her right hand, always ready to help her." To Mrs. Fix, who worked for her, Mrs. Fowler said: "Let Gina have access to the box." "Everything in those boxes belongs to Gina." To other witnesses, deceased would use such expressions as:

"I don't know what I would do if it wasn't for Gina." "There was just one person to benefit, and that was Mrs. Osterhout." "She might as well be my daughter, because she has been a real daughter to me." "Everything I have goes to Gina." "If I am ever taken sick, Gina is the only sister I ever had." "I want her to be notified the first one." "Gina had been such a good girl to do everything for her—she never did pay her anything at all, and Gina wouldn't let her pay for anything, as far as that was concerned, but the deceased did pay for the gas, that Gina never made

any charges for the things she did." "I have turned everything over to Gina, and it is all in her box, all she is to get out of this when it is over with me."

Prior to the time deceased sold the vaults, she seemed to have had several boxes in which she kept papers, but after the sale, a joint box was taken out for deceased and respondent, and sometime thereafter respondent put on the card which evidenced who had the right of access to the box, "equal rights."

There was testimony that deceased and respondent visited the vaults together, but whether or not respondent ever saw what was in this joint box, does not appear from the testimony.

Respondent's niece, Emily Sprague, testified that, at Christmas dinner, in 1933, at respondent's home, the following conversation took place:

"After dinner we were sitting in the house talking, and Mrs. Fowler made the statement, she said, 'Gina,' she says, 'You know what your duties have been.' She says, 'The last year.' 'You know how much work you are going to have to do.' She says, 'Do you still want to carry thru your agreement?' And she says, 'You know just what the work will be, but if you carry thru the agreement, at the time I die everything I have shall go to you to help pay you for the work you have had.'"

Clayton Osterhout, a son of respondent, and Mrs. Frank Sprague, an aunt, testified to substantially the same facts as Emily Sprague. Clayton Osterhout, who was with his mother at the vault the day Mrs. Fowler died, said his mother was much disturbed because she could find no will, and respondent stated to Mrs. Schlumpf, about a month after Mrs. Fowler's death, that she was surprised that she left no will.

Witnesses for appellants testified that deceased never mentioned her relations with the respondent, and the brother and sister of deceased testified that she never

made any claim to them that there was an agreement between her and deceased. A witness, Mr. Longfellow, who represented deceased as her attorney from 1931 up to the time of her death, testified that, about two months before her death, when he and deceased were in the vaults, the question came up as to where deceased's property would go, and Mr. Longfellow told her that as her parents were dead, her property would go to the brother and sister and nieces, to which deceased replied: "Well, I guess that is just as good a way as any."

Several of respondent's witnesses testified that deceased told them that, where a joint box was taken out, and one of the parties died, the survivor had all that was in the box.

There was some testimony to the effect that deceased did not like wills. It appears from the testimony, however, that deceased drew her husband's will, which was afterwards presented for probate in San Juan county.

There was testimony by some of respondent's witnesses that deceased was estranged from her relatives, but there was also testimony by appellants' witnesses that no such estrangement existed, and that deceased was very proud of her nieces. It also appears that deceased's brother came from Montana and guaranteed the bill for the funeral expenses, and that the sister, Pauline Peterson, and respondent took the remains of deceased to Orcas Island, where they were buried. It further appears from the testimony of the brother that respondent did not seem to know anything about deceased's property.

The question with which we are confronted in this case is whether or not the contract pleaded in respondent's complaint has been established.

This court has held that, in a proper case, spe-

cific performance of an oral contract to convey property may be had. *Velikanje v. Dickman,* 98 Wash. 584, 168 Pac. 465; *Herren v. Herren,* 118 Wash. 56, 203 Pac. 34; *Olsen v. Hoag,* 128 Wash. 8, 221 Pac. 984; *Avenetti v. Brown,* 158 Wash. 517, 291 Pac. 469. We stated, however, in *Lohse v. Spokane & Eastern Trust Co.,* 170 Wash. 46, 15 P. (2d) 271, that, in all the above cases, the contract was proven with definiteness and convincing certainty. In the *Velikanje* case, *supra,* the terms of the contract were proven very conclusively by statements of the deceased, and promisee had actually been on the land for two years. In the *Herren* case, *supra,* the promisee was on the land, and the testimony and surrounding circumstances were very convincing that there was an agreement. In the case of *Olsen v. Hoag, supra,* the promisor lived in the home of promisee, and was given unusual service, and was advanced money. In the *Avenetti* case, *supra,* the terms of the contract were conclusively proven by at least one witness, and the intent of the promisor by many others.

We have also held in many cases that the evidence necessary to sustain an oral contract, such as the one claimed in the instant case, must be conclusive, definite, and beyond all legitimate controversy. *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631; *Frederick v. Michaelson,* 138 Wash. 55, 244 Pac. 119; *Eidinger v. Mamlock,* 138 Wash. 276, 244 Pac. 684; *Henry v. Henry,* 138 Wash. 284, 244 Pac. 686; *Lohse v. Spokane & Eastern Trust Co.,* 170 Wash. 46, 15 P. (2d) 271; *Clark v. Crist,* 178 Wash. 187, 34 P. (2d) 360; *Lager v. Berggren,* 187 Wash. 462, 60 P. (2d) 99; *Wayman v. Miller,* 195 Wash. 457, 81 P. (2d) 501; *In re Fisher's Estate,* 196 Wash. 41, 81 P. (2d) 836.

"To warrant a decree of specific performance thereof, a contract must be definite and certain, and free from

doubt, vagueness, and ambiguity, in its essential elements and material terms. Clearness is required. The terms of the contract must be so clear, definite, certain, and precise, and free from obscurity or self-contradiction, that neither party can reasonably misunderstand them, and the court can understand and interpret them, without supplying anything or supplanting vague and indefinite terms by clear and definite ones through forced or strained construction." 58 C. J. 930, § 96.

Appreciating that the lips of one of the parties to the purported contract herein have been closed by death, and those of the other by statute, we have felt compelled to set out the testimony at some length. Examining the testimony with the rules hereinbefore mentioned in mind, what do we find? A friendship that continued through many years; statements made in casual conversations with disinterested persons, indicating that deceased was going to remember respondent, when deceased passed on, with no reference to any agreement; the testimony of three relatives of respondent that, at a Christmas dinner in 1933, deceased asked respondent if she was satisfied with the arrangements they had, and whether or not respondent desired to continue to do for deceased as she had in the past; that if she did, deceased would, at her death, leave everything she had to respondent, no reference being made to the safety deposit box. There was no will in this case, nor was there any writing of any kind found in the safety deposit box, or elsewhere, showing any indication that deceased desired to have her property go to respondent on her death.

Realizing that the trial court had the advantage of seeing the witnesses in this case, we have examined with great care the statement of facts, to get the full picture as presented by the evidence. The first question which naturally presents itself is: What were the terms of this purported contract? What was the

respondent to do in consideration of deceased leaving this property to her? And what property was respondent to receive? It is true that, in the testimony of the witnesses who were present at the Christmas dinner, it was claimed deceased referred to an agreement and to services performed by respondent, but these statements, it seems to us, fall far short of establishing definitely or precisely the terms of a contract.

Keeping in mind that deceased did not live with respondent, and that all of the services rendered by respondent were such as might have been rendered by a close friend or companion, and apparently were not rendered at any regular times, or in such a way as to indicate any particular obligation upon the part of respondent to so render them, how could a court determine definitely what respondent, on her part, was required to do? And unless the court could definitely determine this, how could it tell whether respondent had performed her part of the contract sufficiently to be entitled to specific performance?

The complaint alleges that deceased agreed that respondent should have all the property in and described in the safety deposit box. No reference is made by any of the witnesses at the Christmas dinner to a safety deposit box, but their testimony was to the effect that deceased said respondent was to have all her property. It seems to us there was a most uncertain and indefinite description of the property to be conveyed. There was nothing to bind deceased to leave ten dollars or ten cents in this box. It is not claimed that respondent ever knew what was in the box; in fact, the testimony would seem to indicate that, regardless of the fact that respondent often went into the vault with deceased, she never knew what was in the safety de-

posit box. It is claimed that, in view of the fact that deceased and respondent had a joint box, and in view of the opinion deceased held as to the rights of the survivor where two people had a joint box, this was an indication that deceased intended respondent to have all her property; but it must be remembered that deceased used this box continuously after the claimed agreement was made, the same as she had done before, and that the only indication of any changed condition was the writing placed upon the card by respondent, indicating equal rights. In addition, and bearing upon the intention of deceased, we have the testimony of Mr. Longfellow, her attorney for many years, that, when he told deceased that her property would go to her brother and sister and nieces, deceased said: "It is as well that way as any."

We feel that grave doubt is cast upon the claim of respondent to any right to the property of decedent by virtue of the joint box, when considered in the light of the statements made by her in her petition to be appointed special administratrix, and in the surprise expressed by her that deceased had left no will or instructions of any kind to her.

Keeping in mind also that, if this contract were upheld, it would result in sustaining an oral contract for the transfer of title to real estate, as well as personal property, we are of the opinion that the evidence herein does not establish the contract pleaded and claimed herein, with that definiteness and convincing certainty which the law requires.

What we have heretofore said about the *Velikanje* case, *supra,* and the other cases cited by respondent, distinguishes them from the instant case.

We have repeatedly reaffirmed the rule that, in the very nature of things, each case of this kind must rest upon its own peculiar facts and circumstances.

176

The judgment is reversed, and the cause remanded with directions to dismiss the action.

BLAKE, C. J., MAIN, STEINERT, and ROBINSON, JJ., concur.