[No. 29201. Department One. June 17, 1944.]

CLYDE PAYN *et al., Appellants,* v. GEORGE HOGE,
*Respondent.*[1]

[1]Reported in 149 P. (2d) 939.

*Wm. A. Johnson,* for appellants.

*O. D. Anderson,* for respondent.

STEINERT, J.—This was an action to compel the defendant specifically to perform an alleged oral contract. Plaintiffs waged their suit upon the theory and contention that the defendant orally agreed with them that, in consideration of personal care and other services to be rendered by the plaintiffs to the defendant during his lifetime, they were to have, for that period of time, the use and occupancy of certain real estate then owned by the defendant, and further, upon his death, to have the full ownership of the property. Defendant denied the material allegations of the complaint, particularly the making or existence of the alleged oral agreement, and, by way of cross-complaint, alleged that plaintiffs were wrongfully withholding the property from him after demand therefor. In his prayer for relief, defendant asked that possession of the property be restored to him, with an award of damages for the unlawful detention. Plaintiffs controverted the allegations of the cross-complaint. The cause was tried to the court without a jury, and a decree was entered dismissing plaintiffs' action, also awarding defendant possession of the property, and allowing him damages in the sum of four hundred fifty dollars. Plaintiffs appealed.

Appellants, Clyde Payn and Myrtle Payn, are husband and wife. For convenience, we shall at times herein refer to them simply as Clyde and Myrtle. Respondent, George Hoge, is Myrtle Payn's stepfather. He married Myrtle's mother, whose given name was Genoah, in June, 1920, at which time Myrtle was still single. Respondent is, and has been continuously since 1909, a locomotive engineer and fireman, in the employ of the Great Northern Railway Company.

At the time of the marriage of Mr. and Mrs. Hoge they

each owned certain separate properties, the extent and values of which, however, do not appear in the record. Shortly after their marriage, Mr. Hoge bought four vacant lots in the city of Everett and built thereon a home for himself and his wife. This is the property involved in this litigation and it is not disputed that it was acquired with community funds. Apparently, Myrtle lived in this home until her marriage, the date of which is not shown.

For some time after the marriage of Clyde and Myrtle, until September, 1933, the young couple lived in Wenatchee. They then returned to Everett and for three or four years resided with Mr. and Mrs. Hoge. Afterwards, they rented and occupied a house a few blocks distant from the Hoge residence.

On the morning of September 17, 1938, Mrs. Hoge was suddenly taken ill in her home, and respondent immediately summoned his stepdaughter, Myrtle. Throughout the day Myrtle attended her mother. That evening Mrs. Hoge passed away. She died intestate, leaving as her sole surviving heirs at law the respondent and the appellant Myrtle Payn.

That same night, or possibly the next day, the respondent and the appellant stepdaughter engaged in a conversation, somewhat in the nature of a family council, in which the oral agreement here sued upon is alleged by the appellants to have been made. The essence of the alleged contract, as pleaded in the complaint, is contained in a paragraph thereof reading as follows:

"That at the time of the decease of the said Genoah Hoge the said plaintiffs [appellants] were residing within the city of Everett and at that time the said defendant [respondent] proposed to the said plaintiffs that they should close their then place of residence and come to live in the above described property, and promised and agreed to said plaintiffs that if they would thus act, move into said property, care for it and keep it as a home so that the defendant might continue to reside in his former home and be cared for therein so long as he lived, that the plaintiffs might reside there as their home during his lifetime and at his decease the property should become theirs."

The complaint further alleged that in pursuance of that agreement appellants moved onto the premises and that they have at all times since cared for the property, have kept and provided a home for respondent, and have made extensive improvements thereon at an expense to themselves of five hundred twenty dollars; but that respondent subsequently repudiated his agreement by notifying the appellants to vacate the premises. Reference to the evidence in support or in refutation of these particular allegations will be suspended for the time being and taken up a little later.

It is conceded that upon the death of Mrs. Hoge the appellants at once took up their residence in the home of the respondent. This was done with the permission and, concededly, upon the invitation of the respondent, who was then about fifty-six years of age. The furniture and furnishings in the house remained in place as before, and to these was added a small amount of similar articles which appellants brought with them. At the same time, respondent retained a furnished bedroom in the home for himself, while the appellants and their young daughter, Betty Lou, occupied the remainder of the house. Mr. Payn was at that time engaged in the market business in Everett.

Respondent continued his work as locomotive engineer and at first, for about three months, was engaged upon a run out of a place called Interbay, where he had a lodging room. On weekends he usually went to Everett and while there occupied the bedroom which he had reserved. At such times, appellants provided his meals and attended to his laundry, without charge to him.

During the next three or three and a half years, with the exception of about three months, respondent was stationed in Canada and while there maintained living quarters either in New Westminster or in Vancouver. During the three months' period just referred to he was on a run out of Seattle, and throughout that period made his headquarters in Everett, under the former arrangement. While in Canada he made weekend trips to Everett only once or twice a month.

About two weeks after the death of Mrs. Hoge, respondent executed a will in which he devised and bequeathed to his "beloved stepdaughter, Myrtle Payn" all his property, real and personal, separate and community. He delivered the will to Mrs. Payn for safekeeping, and she in turn placed it in a safe deposit vault in Everett. In the following year respondent instituted probate proceedings upon his wife's estate, and, in the course thereof, the home property and furnishings, appraised at twenty-five hundred dollars, were set over to him in lieu of homestead.

While stationed and residing in Canada, respondent became ill and for about eight months was unable to work. During that period, in October, 1941, he married his second wife, with whom he has lived ever since.

Throughout the entire period from September, 1938, when appellants took up their residence with him, down to the time of the trial of the present action in June, 1943, respondent has paid all of the taxes and insurance on the property here involved; he also painted the interior of the house, put in a new lawn, and installed a modern oil burner at a cost of three hundred forty-six dollars. During these same years, appellants themselves had some repair and remodeling work done upon several rooms in the house and also installed therein some light fixtures, blinds, and draperies. The cost of this work and installation by the appellants amounted to four hundred twenty-five dollars, or an average expenditure by them of approximately eighty dollars a year. They of course at no time paid respondent any rent.

At Christmas times, respondent customarily gave his stepdaughter sums of money ranging from forty to sixty dollars. At about the time of, or shortly after, the commencement of the present suit, respondent deeded to Myrtle Payn a piece of improved property which had formerly belonged to Mrs. Hoge and which, at her death, had descended to respondent and Myrtle Payn in equal shares. That property had originally been encumbered with a mortgage of one thousand dollars, of which Mr. Hoge paid the

balance of six hundred dollars subsequent to Mrs. Hoge's death.

The relations between the respondent and the appellants, under the circumstances and conditions thus far recounted, were, and continued to be, in all respects, with the exception of one incident occurring in 1940, entirely harmonious until the summer of 1942, when respondent and his second wife contemplated moving from Canada to Everett. However, for some reason or other, which is not made entirely clear by the record, friction developed in the last mentioned year. Appellants seem to have become apprehensive that respondent and his new wife were planning to move into the house with them, although respondent had taken no active steps in that direction. Mrs. Payn stated that she would move out of the house, rather than occupy it with the Hoges.

About this same time, also, some altercation arose between the parties with reference to the condition and manner of operation of a door on the garage located on the property; in consequence of that dispute, respondent put a lock on the door and thus seems to have interfered with appellants' use of the garage. The isolated instance of disharmony, referred to above, occurred some time in 1940, when Mrs. Payn requested respondent to give her a quitclaim deed to the home place. Respondent resented the suggestion and somewhat heatedly declined to accede to the request.

Whatever may have been the initial or real cause of the friction between the parties, it is certain that from the summer of 1942 the estrangement developed rapidly. In the fall of that year, after the friction had reached an acute stage, the parties had some negotiations with each other looking to a possible sale of the home property by the respondent to the appellants for the sum of thirty-five hundred dollars. Respondent was then valuing the property at seven thousand dollars.

There is a dispute as to which of the parties proposed this sale and purchase. Appellants testified that respondent made the offer and that after some consideration they

accepted it, but that in the meantime respondent changed his mind and refused to complete the pending negotiations. Respondent testified that appellants themselves made the proposal, naming the price they would pay; that he was willing at first to make the deal, but owing to appellants' procrastination he changed his mind, and when, after a long time, they signified their willingness to pay that amount, he no longer was interested in the proposition. Whether the one party or the other made the initial offer is of no great importance here, but, as may be inferred, the fact that the parties did actually negotiate on that basis does have considerable bearing upon the question with which we are now primarily concerned.

From this state of circumstances and consequent relations existing between the parties, matters progressed quickly to an open breach. Respondent brought the situation to a head by serving notice on the appellants to vacate the premises. Appellants not only refused to move, but countered with the institution of the present action.

With the exception of certain minor details, there is little controversy between the parties with respect to the facts and circumstances thus far related. The real, as well as crucial, dispute between them is with reference to the transaction or agreement under which the appellants moved into the property in question and thereafter occupied it for a period of over four years. That issue presents the question of whether the parties entered into a binding agreement whereby, in consideration of the personal care and attention to be rendered to the respondent by the appellants, the latter became entitled to the continuous, uninterrupted occupancy of the property during respondent's lifetime and, upon his death, to have complete ownership thereof. Before we analyze the testimony bearing upon that particular issue, however, it is well to have in mind the principles of law governing cases of this general kind.

While the instant case does not strictly or precisely present an example of an alleged oral contract to *convey* or to *devise* real property, it is so nearly one of the same nature

as to be governed by the same legal principles, although, as will appear a little later herein, we have in this instance one factual element which differentiates the case somewhat from those ordinarily coming to this court, and which therefore will require some further notice.

A court of equity will not specifically enforce a parol contract for the conveyance of real estate or an interest therein upon the ground of part performance unless the contract be established to the satisfaction of the court by clear and unequivocal proof, leaving no doubt as to the character, terms, and existence of the contract. 49 Am. Jur. 928, Statute of Frauds, § 622; 37 C. J. S. 824, Statute of Frauds, § 286. A full discussion of this equitable principle, together with an extensive collection of supporting cases, will be found in an annotation appearing in 101 A. L. R., beginning at page 1002.

Our own decisions are in accord with this rule. In *Mudgett v. Clay,* 5 Wash. 103, 31 Pac. 424, we held that while a mere conflict in the testimony is not of itself sufficient ground for refusing relief in such cases, nevertheless the contract sought to be enforced must be clearly and satisfactorily established. In *Vaut v. Vaut,* 118 Wash. 221, 203 Pac. 377, we stated that such agreements must be established by "clear, convincing, unequivocal and definite testimony."

Similar rules with reference to contracts to devise or bequeath property are no less definite and positive. An oral promise to make a will or an oral contract to devise or bequeath property must be established by evidence that is conclusive, definite, certain, and beyond all legitimate controversy. *In re Fischer's Estate,* 196 Wash. 41, 81 P. (2d) 836; *Osterhout v. Peterson,* 198 Wash. 166, 87 P. (2d) 987; *In re Swartwood & Welsher Estates,* 198 Wash. 557, 89 P. (2d) 203; *Dau v. Pence,* 16 Wn. (2d) 368, 133 P. (2d) 523; *Widman v. Maurer,* 19 Wn. (2d) 28, 141 P. (2d) 135.

As stated in a number of the foregoing decisions, each case of this general kind must rest upon its own peculiar facts and circumstances.

The distinguishing factual element between the case at bar and the usual one coming to this court, as typified by the cases cited above, is that in those cases one of the parties affected by the alleged contract was dead at the time specific performance thereof was sought by the other party, while in this case all of the actors are alive and were present at the trial. The reason underlying the adoption of so rigorous a rule and the strict application thereof in the former cases is that the party against whom, or against whose representative, specific performance is sought is not in equal position to present his side of the controversy or to protect his estate. In the case now before us that handicap does not exist, and for that reason it may well be that in such situation the party alleging the oral contract is not required to establish it by quite so high a degree of proof. However that may be, it is nevertheless the burden of the party affirming the oral contract to establish its existence and terms by evidence that is clear, cogent, and convincing to the trier of the fact.

As stated in the case of *In re Fischer's Estate, supra,*

"The duty of such trier of the fact, then, is to consider the evidence, of whatever nature it may be, together with all the facts and circumstances of the particular case, and to affirm or deny the contract according to a resulting fixed conviction or lack of conviction of its existence. The result must depend upon the amount of evidence and the extent of the conviction which it carries."

■ With these principles in mind we come to a consideration of the evidence bearing on the alleged oral contract. The first witness at the trial was Clyde Payn. His testimony on the particular subject was as follows:

"Q. Just tell us what the conversation was, just as closely as you can exactly what was said. A. Well, he [respondent] immediately asked us to stay and prepare a home for him,—stay there and keep house for him and keep the place. Q. What did he say he would do? A. Well, he told the wife that she'd never have to worry, she'd have a home as long as she wanted one, and she could stay there and keep house *as long as he had room there,* and in time that the house would eventually be hers, anyway." (Italics ours.)

Appellant Myrtle Payn was the second witness. She testified as follows:

"Q. How long was it after that before there was talk between Mr. Hoge and yourself about your coming there to live? A. It was that very evening after Mother passed away that he was quite upset, naturally, and he said, 'Well, you'll just have to come over and take your mother's place', he said, 'because that's the only thing for you to do'. And even to the point that there was a large chair there, and he says, 'That's Mother's chair, and I want you to just sit in it just like your Mother used to.' He says, 'This is to be your home'. And he even talked of it that first night. And from then on, it was just every so often that he was telling someone about it. Q. What was that talk? That is to say, you probably can not spend all day telling us those conversations, but tell us approximately the important things in them and when they happened? A. Well, he said there wasn't any use of us detaining [delaying] any longer in going over and getting our furniture. He said, 'Just move over as quickly as you can and take possession of the house'. And he said, 'I have to have someone here to look after it, and I won't rent it', and he said 'It should be yours because you are next to your mother', and also that—I forgot where I was now—also that it would go to my little daughter if anything ever happened to me. He said, 'I wouldn't want to sell the place because it's yours'. And he said he wanted a home for himself, and if I would be willing to keep his work up, and all, why that's the way he would want it to be."

Appellants called as additional witnesses six persons who had been long-standing friends or neighbors of the litigant parties. They testified that, in a number of informal conversations between them and the respondent at different times following the death of Mrs. Hoge, he had stated, in substance, that he was going to give the property to Clyde and Myrtle; that he wanted them to have it so as to make a home for him; that he was glad to have them live in the house and keep it; that he never wanted to bring anyone else into the house; that the home did not mean anything to him if Myrtle and Clyde and Betty Lou were not there; that he was going to give the home to Myrtle; that Myrtle need not worry, because the house would always be her home; that if anything happened to Myrtle the house was

to be Betty Lou's; that he had made out everything to Myrtle and Betty Lou; that, if he ever got married again, he would not occuy the home place, but would buy or build a new one. These conversations took place, of course, some years before the trial at which this testimony was given.

Respondent's narrative of the situation went to considerable length and put a different complexion upon the matter. He denied categorically that he ever made, or ever intended to make, any such agreement as that which appellants assert. His version of the affair was, in substance, as follows:

About the time of Mrs. Hoge's death, appellants, who were living in a rented house near by, were in straitened financial circumstances, having just started in a business in Everett. Myrtle had often complained to him that she did not know what she was going to do. The sudden death of Mrs. Hoge had been a shock to all of them and left them grief-stricken. Naturally, under such circumstances they were drawn closely together. During the period elapsing between the death and the burial of Mrs. Hoge, appellants remained in respondent's home. In the discussions which ensued during that period, Myrtle again spoke of her straitened circumstances, and respondent told appellants that he would "help them out." He suggested that they remain in the home with him, bringing over whatever of their own furniture they desired. He told them that they would not have to pay any rent and that they could stay as long as he had room for them. Parenthetically, it may be noted that appellant Clyde Payn corroborated respondent to the extent that the latter had told Myrtle that she could stay in the house as long as respondent had room for her. Appellants were pleased with the suggested arrangement and it was agreeable to respondent under the conditions then existing. Having no near relatives of his own, and being devoted to Myrtle and her daughter, it had been his intention to leave the property, at his death, to the one or the other. Pursuant to that intention, within a few weeks after his wife's death, he made the will referred to above. An additional reason for making the will so promptly was that he

wanted to obviate any difficulty that might arise if he should die intestate.

With this understanding, appellants and respondent occupied the home together, under the arrangement described above, and for nearly four years everything was harmonious between them, except for the one occasion when Myrtle suggested that he give her a quitclaim deed to the property.

After his second marriage, his railroad run was changed to the territory lying between Bellingham and Everett. He therefore contemplated bringing his wife to Everett and eventually moving into his old home there. Appellants sensed his desire and became apprehensive. Although he took no immediate steps to effectuate his occupancy of the house, the relations between him and the appellants nevertheless became strained. Arguments arose and friction developed.

Finally, in that situation, Myrtle told him that she wanted to buy the home and asked him how much he wanted for it. He told her that he would let her have it for thirty-five hundred dollars. About a month later, respondent met the appellant Clyde Payn and asked him whether he and Myrtle intended to buy the place. Clyde thereupon raised some question about a commission, and respondent told him there would be no commission. Clyde then said "I'll see about it." Several weeks thereafter, Clyde again met respondent and then reported that they were ready to buy the property. Respondent, however, had changed his mind about selling and refused to negotiate further. According to appellants' testimony they had, in the meantime, "things all fixed" to buy the place.

Respondent's explanation of his conversations with the various neighbors and acquaintances, at about the time of Mrs. Hoge's death, was that they were constantly manifesting an inquisitiveness concerning his private affairs, asking him what he was going to do, and that he had given them general answers only, to the effect that matters between him and the appellants had been satisfactorily arranged; that they could stay in his home as long as he had room for

them; and that eventually, after his death, they would get the place. He denied emphatically, however, that he had told any of those persons anything indicative of a contract with reference to the house, its occupancy, or its ultimate disposition.

The trial judge carefully analyzed and weighed the entire evidence in the light of the rules above stated, as is manifested by his lengthy memorandum decision appearing in the record. His conclusion was that the informal arrangement under which the parties had maintained a common home for a period of four years following Mrs. Hoge's death was a perfectly natural one, because of the peculiar circumstances and the relationship existing between the parties. He was also of the view that originally respondent's full intention was to leave the property, at his death, to his stepdaughter, and that such intent was likewise natural under the circumstances then existing. However, the trial judge was further of the firm belief, from the evidence, that the parties never intended to enter into a binding contract that appellants should have the present permanent possession of the property, or that respondent was obligated to make a will leaving the property to them. As stated by the trial court, mere intention on the part of a person to make a will does not create a contract to do so, nor does the execution of a will by a person prove that it was done in the performance of a contractual obligation.

The substance of the trial court's conclusion was that the parties had enjoyed an harmonious but indefinite arrangement under which the appellants were permitted to occupy respondent's home as long as it was mutually agreeable and that at the same time respondent intended ultimately to leave the property to his stepdaughter; but that no binding agreement with reference to permanent occupancy of the house or with respect to its ultimate disposition was ever made.

The court's view was, to some extent at least, influenced by the fact that appellants latterly had endeavored to buy the property from the respondent, and thus had taken a position utterly inconsistent with their theory of a contract un-

der which they would be entitled to present possession and ultimate ownership of the property.

Without going into further detail, we will say that we are in full accord with the trial court's views and are convinced that appellants have not established their alleged oral contract by the degree of proof required in such cases. This disposes of the first, and principal, question in the case.

■ Appellants further complain that the trial court erred in fixing the amount of damages allowed to the respondent as rental from the time appellants were ordered to vacate the premises. The only evidence on that subject was the testimony of an experienced rental agent. He testified that the fair rental value of the property, furnished as it is, was from fifty to fifty-five dollars a month, or, unfurnished, from forty to forty-five dollars a month. The court fixed the monthly rental at fifty dollars.

Appellants argue that, since respondent reserved a bedroom for himself, they did not have full possession of the entire house and therefore should not be required to pay its full rental value. The answer to that argument is that, from the time of respondent's notice to them to vacate the premises, they have had the full and exclusive use and occupancy of the entire house.

Appellants also argue that a part of the furnishings in the house belongs to them, for which they should not be required to pay rent. The record is not very clear as to how much of the furniture is theirs. In any event, it was not a great deal, for the house was completely furnished when they moved into it. Furthermore, they offered no evidence as to the rental value of their portion of the furniture, and it will be noted that the trial court allowed the lowest amount estimated to be the rental value of the house as furnished. We do not believe that appellants have any just cause for complaint in this respect.

■ In their brief, appellants make the further contention that respondent has no right to evict them from the premises, because of certain regulations adopted by the Office of Price Administration, a Federal agency. These regulations were never brought to the attention of the trial

46

court, either in the pleadings or by the evidence; nor is there anything in the record to indicate whether or not the property in question is located within an area covered by the regulations as quoted, for the first time in appellants' brief. The matter not having been brought to the attention of the trial court, it will not be considered on the appeal. *In re Corneliusen's Estate,* 182 Wash. 488, 47 P. (2d) 843; *Unemployment Compensation Dept. v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89.

■ Finally, appellants assign as error the trial court's refusal to allow them credit for the improvements which they made upon the property here involved. Their contention in this regard is based upon Rem. Rev. Stat., § 797 [P. C. § 7523] which provides, in part, as follows:

"In an action for the recovery of real property upon which permanent improvements have been made . . . by a defendant . . . holding in good faith under color or claim of title adversely to the claim of plaintiff, the value of such improvements . . . must be allowed as a counterclaim to the defendant."

The amount expended by the appellants for improvements was four hundred twenty-five dollars. Not more than one-half of this amount could be said to be for "permanent" improvements. In no event, however, could the above statute be held applicable here. The appellants did not establish the alleged oral contract; on the contrary, the trial court held that appellants' occupancy and use of the property were merely permissive and at the sufferance of the respondent. Hence, they were not holding the property "in good faith under color or claim of title *adversely to the claim of plaintiff.*" (Italics ours.)

■ As shown by respondent's testimony, and as pointed out by the trial court, whatever appellants brought or added to the property was merely for their own convenience and enjoyment. They simply replaced certain fixtures with others more to their liking. Respondent did not ask them to do these things, but merely acceded to their request or desire for permission to do them. Under such circumstances ap-

pellants are not entitled to recover the value of the improvements. *Wallace v. Wallace,* 112 Wash. 14, 191 Pac. 793.

In view of the peculiar circumstances and conditions under which the parties to this action dealt with each other, and out of which this controversy ultimately developed, we have taken pains to consider and determine whether there are any equities which would entitle appellants to any reimbursement for the amount expended by them on the property. Under the facts as they have been resolved by the trial court, we have concluded that there are no such equities. The appellants have had the use of the premises free of rent for approximately four years. The rental value of the property for that period was far in excess of the value of any improvements, permanent or temporary, installed by the appellants. There is no evidence as to the number or value of the meals furnished to the respondent by the appellants, nor is there any evidence as to the amount or value of laundry work done by the appellants. At best, the total amount could not have been a great deal, for respondent was seldom in the home except during a short period of time. We are well convinced that appellants have profited far more than they have expended either upon the property or for the benefit of the respondent.

The judgment is affirmed.

SIMPSON, C. J., BEALS, JEFFERS, and GRADY, JJ., concur.