[No. 29742.   *En Banc.*   August 22, 1946.]

GEORGE R. JENNINGS, *Respondent*, v. C. J. D'HOOGHE, *as Administrator, Appellant.*[1]

*Clarence S. Lind* and *Peter A. McDonald,* for appellant.

*Josiah Thomas* and *Clarence L. Gere,* for respondent.

[1]Reported in 172 P. (2d) 189.

SIMPSON, J.—This action was instituted to compel specific performance of an oral contract. The complaint alleged facts showing the death of John Tonjum and the appointment of C. J. D'Hooghe as administrator of his estate. Plaintiff then alleged that, during Tonjum's lifetime, he and Tonjum had entered into a contract whereby it was agreed that,

" . . . if plaintiff would give up his work and act as his housekeeper, cook, nurse and care for the garden, he would provide plaintiff with a comfortable home and living, and in case plaintiff should survive him, he would leave plaintiff all of his estate, whether real, personal or mixed; that plaintiff accepted said offer of defendant's intestate and agreed with him in all respects in accordance with said offer, and ever since that date he has carried out his part of said agreement."

It was further alleged that the administrator of the Tonjum estate had refused to comply with the terms of the agreement. Defendant denied the allegations relative to the contract, and then alleged that the contract was oral and, therefore, within the statute of frauds, in that it was not to be performed within one year, and purported to convey an interest in real estate. Trial to the court resulted in the entry of a decree awarding to plaintiff the entire estate of John Tonjum. Defendant then appealed to this court.

Appellant's assignments of error call in question the action of the trial court in awarding the estate of John Tonjum to respondent.

The facts in this case, undisputed in the main, are as follows:

Respondent and John Tonjum were friends and had lived together for about twenty-five years. Tonjum had been an orderly in the city police hospital. In the early part of 1935, Tonjum purchased land, upon which stood a four-room house. It was here that the two men made their home. On October 15, 1935, Tonjum was knocked down and kicked by a hospital patient. The injury was so severe that he was, for a greater portion of his life thereafter, bedridden and unable to work. In the years following the injury, he, for much of the time, had no control of his organs of elimination

and required almost the same care as an infant. His doctor prescribed special diets. In addition, it was necessary that he be accompanied on his numerous visits to the hospital for treatments. These duties were carefully and conscientiously performed by respondent. Respondent also, to a great extent, supported himself and Tonjum by raising a garden and maintaining a business in chickens, eggs, and berries.

All moneys were pooled with the pension received by Tonjum. In 1936, respondent received five hundred thirty dollars as a soldier's bonus, which was used by him in improving the property upon which the two men lived. By 1942, Tonjum had recovered somewhat and worked as a guard for a detective agency and for the Western Gear Works. During that time, he received from two hundred to two hundred sixty dollars a month besides his pension. This money was used in maintaining the home.

In considering the facts in this case and the law applicable thereto, we do not lose sight of the following statutes:

Rem. Rev. Stat., § 1395 [P.P.C. § 219-3]: "Every will shall be in writing signed by the testator or testatrix, or by some other person under his or her direction in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator or testatrix by his or her direction or request: . . ."

Rem. Rev. Stat., § 10550 [P.P.C. § 497-1]: "Every conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed: . . ."

And Rem. Rev. Stat., § 10551 [P.P.C. § 498-1]: "Every deed shall be in writing, signed by the party bound thereby, and acknowledged by the party before some person authorized by this act to take acknowledgments of deeds."

We also have in mind the following rule:

■ Cases of this kind are not favored and, when the promise rests in parol, are even regarded with suspicion, and will not be enforced except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the deceased. *Alexander v.*

*Lewes,* 104 Wash. 32, 175 Pac. 572.

In addition:

"The rule seems to be well settled that to enforce a parol contract to make a will there must have been at least some substantial thing done by the testator in his life time in pursuance of that contract. This seems to be required for the purpose of placing the proof of the contract beyond all legitimate controversy, and bears directly upon the question of the proof. The fraud to be prevented is the danger of the fraudulent establishment of such contracts, and this is the purpose of the provision of the statute; and the cases which hold that a performance upon the part of one party alone is sufficient seem to lose sight of this fact and assume that the contract can as well be established by the acts of one party alone." *Swash v. Sharpstein,* 14 Wash. 426, 44 Pac. 862, 32 L. R. A. 796.

"The court below instructed the jury that, before they could find for respondent, they must find that, from the time Anna O. Miller came to live at his home, she intended to pay for her support and maintenance, and that the intention to charge and the intention to pay for such support and maintenance must have been in the minds of both parties. Such is unquestionably the law. When such a relation as we here find is assumed, there can be no recovery by either party unless there be a contract to charge for the services rendered by the one party, or a contract to pay for the support furnished by the other party. Otherwise it will be presumed that the relation was one of mutual benefit, and both the service and the support a gratuity. 18 Cyc. 410; *Butcher v. Geissenhainer,* 109 N. Y. Supp. 159. Not only must a contract be established, but the relation of the parties must have had its initiation in such a contract, when it is sought, as here, to support the cause of action upon the original relation.

" 'All contracts must be good or bad in their original creation, and must not depend on subsequent contingencies; that is, whether the party chose to make it a gift, or a charge at a future day or not. That it will never permit a friendly act, or such as was intended to be an act of kindness or benevolence, to be afterward converted into a pecuniary demand.' *James v. O'Driscoll,* 2 Bay (Mo.) 101, 1 Am. Dec. 632.

"The amount to be paid need not have been agreed upon, since the law can, by implication, supply a promise to pay,

when it finds an agreement for the rendition of services. But the implied promise to pay must be based upon the agreement for service and not upon the performance of service, where, as here, there is shown to have been a mutual service." *Anderson v. Osborn,* 62 Wash. 400, 114 Pac. 160.

■ The burden of proof was upon the proponent of the contract to prove it by evidence that was conclusive, definite, certain, and beyond all legitimate controversy. *Resor v. Schaefer,* 193 Wash. 91, 74 P. (2d) 917.

The last-mentioned rule has been firmly adhered to by this court in every case of this nature except in *Herren v. Herren,* 118 Wash. 56, 203 Pac. 34, and *Avenetti v. Brown,* 158 Wash. 517, 291 Pac. 469, where it is said that it is sufficient that the contract can be determined with reasonable certainty.

■ This court has held that the above statutes do not apply in instances in which oral contracts are made to convey property by will and the consideration has been fully paid. However, in such cases, in order to take the contract out of the statutes, the proof must show: (1) that deceased agreed to will or leave to the claimant certain property; (2) that the services contemplated as consideration for the agreement were actually performed; and (3) that the services were performed in reliance upon the contract.

■ Each case of the kind now before us must rest upon its own peculiar facts and circumstances. However, individual cases cannot be decided without reference to other cases of like nature. The facts appearing in formerly adjudicated cases should and must be a guide to the determination of each case as it comes to the courts for decision. It will not do to make different decisions on cases that are alike as to the facts. The reason for this rule has been very definitely and clearly stated by Justice Cardozo in The Nature of the Judicial Process, p. 33:

"I am not to mar the symmetry of the legal structure by the introduction of inconsistencies and irrelevancies and artificial exceptions unless for some sufficient reason, which will commonly be some consideration of history or custom or policy or justice. Lacking such a reason, I must be logical,

just as I must be impartial, and upon like grounds. It will not do to decide the same question one way between one set of litigants and the opposite way between another. 'If a group of cases involves the same point, the parties expect the same decision. It would be a gross injustice to decide alternate cases on opposite principles. If a case was decided against me yesterday when I was defendant, I shall look for the same judgment today if I am plaintiff. To decide differently would raise a feeling of resentment and wrong in my breast; it would be an infringement, material and moral, of my rights.' Everyone feels the force of this sentiment when two cases are the same. Adherence to precedent must then be the rule rather than the exception if litigants are to have faith in the even-handed administration of justice in the courts."

Following we quote all of the essential testimony which has to do with the supposed contract:

Mr. Ellison, a neighbor and close friend of both of the parties, testified by deposition as follows:

"Q. I understand that you left in November of 1937. Did you see Mr. Tonjum after that time? A. In May 1943. Q. What was said at that time? A. At that time I asked Mr. Jennings to go to Canada with me on a government—or on a job where he could make and clear himself a good sum of money, and Mr. Tonjum refused and Mr. Jennings refused. He said that he had given an agreement to Mr. Tonjum that he could not leave him, and Mr. Tonjum said he could not get along without George Jennings. If he did leave he would not be able to hold down his job because his strength was not such that he could look after his home and hold down the job, and that the home and all that he had was to be George's in case anything happened to him if he stayed and took care of him as he had in the past under their former arrangement."

George Cecil Vaughn said:

" 'If Mr. Jennings cooks for me, takes care of me, does my housework and my washing and bathes me, when I die he will receive everything.' "

Jessie Marie Vaughn testified concerning Mr. Tonjum:

"He was so sick there for a time he used to think he was going to go. He used to say if he did, for all the work that George had done for him and everything, he wanted him to have everything."

Thomas Wilson made a statement as follows in reference to Tonjum:

"Shortly after he was hurt he really doubted he was going to live and he wanted George to take care of him at all times and if anything happened to him everything he had was George's anyway so it didn't make any difference."

We quote the following from the testimony of Glen Watkins:

"John says, 'What, you got a will?' and we told him and we even made out a will—well, he says, 'I never made out one,' or words to that effect. He says, 'One thing I don't want my folks to have any of my property.' Well, I says to him, 'You better make out a will then, John, or if you don't they will probably get it.' He say, 'Well, I don't want them to have it' and he says, 'I guess I will have to make out a will then,' he says, 'I want to leave all my stuff to Jennings'—'George' as he called him. And that was about the only conversation we ever had on that part of it."

The testimony of Clara Watkins was to the same effect.

Another witness, Jennie Partridge, testified that Tonjum said: "I don't need to worry about it. If anything happens to me, I will leave everything to George."

The pertinent part of Mr. Ellison's testimony with reference to what Mr. Tonjum would do is summed up in the quoted portion of his testimony:

"If Mr. Jennings would take care of his home, take care of the grounds, and wash his clothes, and take care of the property, and look after him while he was sick, that he wanted him to have everything that he owned, that he did not want his relatives to have anything."

This court has decided thirty-seven cases relative to oral contracts to make mutual wills, or wills in consideration of services to be rendered. In twelve cases we have held the contracts to be valid and in twenty-five cases enforcement of the alleged contracts has been denied. In order to show that the facts in the instant case are alike to those in the last-mentioned cases and dissimilar to those in the first class of cases, we set out the principal facts in all of them.

In the first set of cases we find that opinions were based upon the following facts:

*Coleman v. Larson,* 49 Wash. 321, 95 Pac. 262. Deceased, who was ill, wrote her brother, respondent in the case, that she wished him to give up his home in California and move to Seattle to be with her in consideration for the property she then owned. There was definite evidence that deceased had stated that the property belonged to respondent, although she had deeded part of it to him and offered the remainder for sale. In affirming the judgment this court stated that it was clear that an offer had been made and accepted.

*Worden v. Worden,* 96 Wash 592, 165 Pac. 501. A nephew of the deceased promised to farm the deceased's land and care for him in exchange for the devise of the land. The testimony of eight witnesses, not rebutted, demonstrated that such an agreement had been made. Further than that, the evidence showed that deceased had made a will (which failed for want of statutory compliance) which showed that the contract was made as contended for by the plaintiff in the action.

*Velikanje v. Dickman,* 98 Wash. 584, 168 Pac. 465, had to do, among other things, with a contract for specific performance of an alleged oral contract in which decedent promised respondent that he would leave him his real property in exchange for personal care. There was abundant evidence to show that an oral contract was made by the terms of which the owner of the land was to leave it to respondent, the consideration being personal care of the owner. At one time deceased instructed respondent to bring him the deed and abstract and then said:

" 'Here now, you have got the deed and abstract and the place is yours and nobody can take it away from you after I am dead, and you stay with me as long as I live.' "

A study of the above case shows it to be unique, in that the testimony is so clearly to the effect that the land would be willed in consideration of personal services.

In *Alexander v. Lewes,* 104 Wash. 32, 175 Pac. 572, the testimony was very definite that certain property would be willed in consideration of work performed by the individual who afterwards sought to enforce the oral agree-

ment. In addition to the oral testimony, it was shown that a contract and will had been made which clearly and positively showed an agreement to convey the property or leave it by will to the individual who performed the services.

*Herren v. Herren,* 118 Wash. 56, 203 Pac. 34, relates to an action to enforce an oral contract to leave property by will. In that case, husband and wife owned certain real estate which they attempted to deed to their son in consideration of services which he had performed. The deed was signed by the husband, but not by his wife. Mrs. Herren, however, testified that she probably would have signed the deed had she been requested so to do. Based upon the signing of the deed by the husband and the statement just referred to made by his wife, the court decided that the property should be conveyed to the proponent of the contract.

*Slavin v. Ackman,* 119 Wash. 48, 204 Pac. 816, was one to quiet title to real property. In addition to the oral testimony introduced in that case, there was introduced a letter from the deceased requesting that respondent leave her home and take care of deceased in exchange for the property which she possessed. It was also proven that respondent complied with the contract and, shortly before the death of deceased, received a deed to the property. Before the deed was put on record, another deed had been made to another individual. This court held that a contract to will the property had been made, and that the one who received the second contract knew of the deed. Specific performance was decreed.

*Swingley v. Daniels,* 123 Wash. 409, 212 Pac. 729. Pursuant to an alleged oral contract, respondent and his brother and sister executed and delivered deeds conveying certain real property in controversy to deceased in exchange for his promise to devise the property to them. The will was executed in conformity thereto at the same time, and the documents were deposited with an attorney. Thereafter, the deceased recovered them and in 1917 deeded some of the property to others. The proof, based upon the writings and definite evidence as to the contract, resulted in sustaining the agreement.

*Olsen v. Hoag,* 128 Wash. 8, 221 Pac. 984. It appeared that the plaintiff in the action, appellant in this court, performed services for Mary E. Cooney and also for Robert J. Cooney when he was ill and unable to do manual labor, all under a contract that Robert J. Cooney would will to appellant certain property. The contention of the appellant was supported by the evidence of several witnesses relative to statements made by Robert J. Cooney that he would leave his property to the appellant. The testimony was supported by a will made by Mr. Cooney in August, 1921, by the terms of which he bequeathed to appellant all of his property and stated that the will was made in view of numerous kindnesses extended to the maker of the will. Later, another will was made leaving the property to another individual. This court considered the evidence of the various witnesses, but based its decision very largely upon the fact that the first will was made leaving the property to the appellant and therefrom held that the contract was an enforcible one.

*Perkins v. Allen,* 133 Wash. 455, 234 Pac. 25. This court held that a contract had been made to devise property in consideration of the releasing of certain property to deceased. Again the court based its decision largely upon the fact that a will had been made which was similar to the terms of the alleged contract, even though the subsequent will changed the name of the beneficiary.

*McCullough v. McCullough,* 153 Wash. 625, 280 Pac. 70. In this case, instituted for the purpose of compelling the performance of an alleged oral contract to will property, the court found that there was an oral contract made by the deceased to will property in consideration of the performance of certain acts. Thereafter, a will was made by the deceased which to a large extent followed the provisions of the contract. Later, another will was made which did not follow the terms of the agreement. The court in deciding the case based its decision to a large extent on the fact that the deceased had indicated and approved the terms of the contract by the making of the first will.

*Avenetti v. Brown,* 158 Wash. 517, 291 Pac. 469. The testimony in this case clearly upheld the contention of the

respondent that a contract had been made by the respondent's deceased brother to leave all of his property to her because of the care she had given to deceased. One of the deciding factors was that the deceased within a month or two before his death asked a neighbor and friend to go to town with him so that he could make his will giving all of his property to respondent, who was the one seeking performance of the contract.

*Resor v. Schaefer*, 193 Wash. 91, 74 P. (2d) 917. The testimony of disinterested witnesses was definite that deceased had made a contract to devise respondents all of his property in consideration of their taking care of him during the remainder of his life. The evidence in this case was more substantial and to the point than in any of the other cases reviewed. Many of them, as we have indicated, were based to a certain extent upon statements made against interest, but, as we have stated, in this case the testimony showed that a definite contract had been made.

In *Luther v. National Bank of Commerce*, 2 Wn. (2d) 470, 98 P. (2d) 667, there was no dispute as to the facts. It appeared that the deceased induced respondent to sell her hospital, which was a profitable concern, and to live with him and care for him during the remainder of his life. In return, he promised to build and deed to her a nice home, provide her with a good living, and devise and bequeath to her all of his property. Clearly, the admitted facts justified the court in compelling a specific performance of the contract.

In the second class of cases, we note facts as follows:

*Swash v. Sharpstein*, 14 Wash. 426, 44 Pac. 862, was an action against an executor of an estate by decedent's daughter for a specific performance of an oral contract to will property. The making of the contract was proven by clear and explicit evidence as to its terms and was not contradicted. However, plaintiff's prayer for specific performance was denied on the ground that it was not shown that there had been a part performance by the deceased. It was held that part performance by the deceased was necessary.

In *Anderson v. Osborn,* 62 Wash. 400, 114 Pac. 160, 32
L. R. A. 796, it appears that services were rendered to an
individual for a period of thirty years. Deceased began to
live with respondent, a bachelor, when his sister, who was
his housekeeper, died. The evidence showed that the re-
spondent had supported and provided for the deceased dur-
ing many years. Testimony further showed that, sometime
subsequent to the initiation of the arrangement, deceased
told a third party that she would pay respondent well for
what he had done, and that what she had was left to him.
This court, in reversing the judgment of the lower court,
held that there was no proof of an original contract or agree-
ment containing a promise of either party.

In *In re Edwall's Estate,* 75 Wash. 391, 134 Pac. 1041.
Mutual wills. On July 3, 1909, deceased and his widow, the
appellant here, individually executed wills bequeathing
all of the respective individual's property to the other. Al-
though similar in content and form, there was no reference
or indication that they were mutual wills. In 1910, deceased
revoked the 1909 will and executed another devising and
bequeathing his property to another. The appellant con-
tended that there was a contract between the parties, and
that the execution of the wills was a partial performance
which removed the contract from the statute of frauds.
After assuming that there was an oral contract for the execu-
tion of the wills, the court held that the wills did not con-
stitute written evidence of the contract, nor did they con-
stitute partial performance of the contract.

*McClanahan v. McClanahan,* 77 Wash. 138, 137 Pac. 479,
Ann. Cas. 1915A, 461. Mutual wills. Where there was an
oral agreement between husband and wife to execute wills
each for the benefit of the other, and this was done, it was
held that there was not sufficient part performance to re-
move the contract from the statute of frauds, and the later
will superseded the former will.

Respondent in the case of *Wall v. McEnnery's Estate,*
105 Wash. 445, 178 Pac. 631, brought an action for specific
performance of an alleged contract by the terms of which
deceased promised that he would adopt plaintiff and be-

queath all of his property to her. It was asserted that the contract had been made in writing, but had been lost. With respect to the proof of a contract, this court stated:

"Keeping in mind that the action is upon a contract said to have been in writing, and that the right of respondent, if any, grows out of the written contract and not out of the relation of adoption, and that the terms of the contract must be supplied by oral testimony which must be clear and convincing, we are inclined to hold that the contract has not been established with that certainty that would warrant a court of equity in granting the relief prayed for."

In *Andrews v. Andrews,* 116 Wash. 513, 199 Pac. 981, it was claimed by appellant, the son of deceased, that an oral contract to care for and attend deceased in appellant's home in return for the devise of deceased's property had been entered into. The facts show that deceased lived with appellant and his wife for many years; that at one time a will was made in favor of the son, but was afterwards changed by codicil. Neither document complied with statutory requirements. In speaking of the alleged contract, it was stated:

"The first question we must discuss is whether the original contract was made. It is a well settled principle of law that contracts of this character must be established by clear and convincing evidence."

It was held that the contract had not been proven by sufficient evidence.

In *Sweetser v. Palmer,* 147 Wash. 686, 267 Pac. 432, appellant contended that there was an oral contract between deceased and himself whereby in return for his living with, and helping work the farm of, deceased, he was to receive the property at her death, or in the alternative, payment for his services. The undisputed evidence showed that appellant had lived and worked on the farm for twenty-six years, and had received board and room and expense money. The court held that no definite agreement had been proven, and stated that it was more probable that the parties were engaged in a joint adventure.

*Fields v. Fields,* 137 Wash. 592, 243 Pac. 369. Appellant was brought up by deceased and his first wife. At the time

he was about four years of age, according to the testimony of one witness, deceased promised appellant's father that he would adopt appellant. This occurred in the presence of several neighbor witnesses, and one witness believed that something was said about appellant becoming the heir, although the event was forty-five years previous to the trial. Appellant sought recovery on the alleged agreement between the deceased and appellant's natural father. Held: The proof of the agreement was too uncertain.

*Frederick v. Michaelson,* 138 Wash. 55, 244 Pac. 119. Appellants claimed that they had taken care of deceased for a considerable length of time. The evidence in support of the alleged contract was largely testimony as to conversations had by various people with the deceased in which he stated that he intended to give his property to appellants. This court held that there was not sufficient evidence to remove the cloud of suspicion which hangs over such claims.

*Eidinger v. Mamlock,* 138 Wash. 276, 244 Pac. 684. It was respondent's contention that he and his sister, the appellant in the case, orally agreed with their father, the deceased, that, in exchange for their quitclaim deed to all of the property left by their mother, his wife, at the time of the administration of her estate, the father would devise and bequeath all of his property to them in equal shares. The quitclaim deed, which recited consideration of love and affection and ten dollars, was executed, but the will made some time later was inconsistent in its terms with the alleged agreement. His final will, drawn some four years after the making of the alleged contract, devised most of the property to the appellant. Respondent offered a document, signed two years after the quitclaim deeds were delivered, which was a unilateral promise of the deceased to divide his property equally. The only oral proof respondent offered was his own testimony that, at the time of the alleged agreement, the deceased's attorney told respondent that if he would sign the quitclaim deed his father would no doubt do right by him. In deciding that there was not that degree of certainty required by the law to establish the making of such an agreement, the court said:

"The dangers incident to the establishment of the existence of such an oral agreement has been emphasized by this court, and the necessity of proof of the most convincing nature to establish such an agreement has been repeatedly held by this court."

*Henry v. Henry,* 138 Wash. 284, 244 Pac. 686. In this case, the evidence to support the contract consisted of isolated and indefinite statements made by an individual to leave all of his community property to a nephew working for him on a salary. This court held that the evidence was not sufficient to sustain the alleged contract.

*Whitaker v. Titus,* 166 Wash. 225, 6 P. (2d) 649, was an action to impress a trust upon an estate. The complaint alleged that the deceased, respondent's brother, had orally agreed with their mother that, in consideration of receiving certain property, he would devise to respondent the property conveyed. The evidence showed that the property was deeded to respondent and her brother with the evident purpose of avoiding inheritance taxes. The court held that there was not sufficient oral evidence to support the allegations of the complaint.

In *Lohse v. Spokane & Eastern Trust Co.,* 170 Wash. 46, 15 P. (2d) 271, it was claimed that an oral agreement had been made with appellant whereby, in consideration for personal care, the deceased would leave her all of his property. It was shown that the deceased had not complied with the terms of the alleged contract. There was evidence introduced which proved that the agreement was made in very definite terms. This court, however, held that the evidence was not sufficient to compel a specific performance. This holding was based upon the rule that such contracts must be sustained by testimony which is conclusive, definite, certain, and beyond all controversy.

*Clark v. Crist,* 178 Wash. 187, 34 P. (2d) 360, was an action for specific performance of an oral contract wherein the deceased and respondent agreed to pool their resources, enter the hotel business, and make mutual wills. The only proof offered, aside from vague statements by neighbors that the deceased had expressed appreciation for what the

respondent had done for her, was the testimony of respondent's brother regarding a conversation in which deceased said that respondent had been very good to her, that they had agreed to buy a hotel and run it together, that they were to pool their possessions, and that they had agreed to make mutual wills. There was one corroborating witness to this testimony. On the other hand, it was shown that the deceased did not discuss her personal affairs, never gave any indication that she wished to enter business, and seemed content to live a peaceful life. The parties never lived together, and there was no evidence as to what the parties intended to do if the deceased purchased the hotel, which she didn't do. In reversing the decision, thereby ordering the escheat of the property to the state, the court said:

"In our opinion, the evidence in this case is not conclusive, definite, certain and beyond legitimate controversy, as the rule in such cases requires."

*Lager v. Berggren,* 187 Wash. 462, 60 P. (2d) 99. This action was for specific performance of an alleged oral contract. It was contended by the respondents that they had orally agreed with the deceased if respondents would purchase some property and construct a dwelling in which deceased, who was retired, could live, he would advance the money, and his board and room and other services would be credited against the amount thus advanced. It was further alleged that, pursuant to this agreement, the property was purchased and the arrangement put into effect. Prayer was for conveyance of the property to respondents or, in the alternative, for a money judgment for services rendered, the value of which was more than that of the property. The evidence demonstrated that the deceased purchased the land and constructed the dwelling in which the parties lived; that, while this arrangement was in effect, respondents paid to the deceased, over a period of seven years, in amounts of twenty dollars, the approximate sum of seven hundred dollars noted by deceased on receipt stubs as "rent." The court in reversing the judgment said:

"It is impossible, giving respondents' evidence the most favorable construction, to find that there was any definite contract between the parties."

*Wayman v. Miller,* 195 Wash. 457, 81 P. (2d) 501. The appellant alleged that the deceased persons, his aunt and uncle, agreed to convey to him a farm of considerable value in consideration of his living with them and acting in lieu of a son. The uncle and aunt died intestate. Appellant had lived with them approximately a year and then established his own home, although remaining on friendly and affectionate terms with them for the remainder of their lives, a period of some twenty-eight years. Proof of the agreement was the testimony of two witnesses. One testified that appellant's deceased uncle had told him that appellant was to get the property, and the other stated that said deceased had told him that they had agreed that if appellant would remain nearby and be a son he should have the property. Further, there was a holograph drawn by the deceased aunt of appellant which indicated an intent to give appellant the property. The court quoted the rule of *Henry v. Henry, supra,* as supporting the following statement:

"To obtain relief under such a contract, the claimant must establish the same by evidence which is clear, definite, and certain, beyond all reasonable criticism."

Judgment dismissing the action was affirmed.

*Osterhout v. Peterson,* 198 Wash. 166, 87 P. (2d) 987. Respondent was a close friend and companion of deceased and claimed that deceased promised that upon her death respondent should have all of the property in a safety deposit box which they jointly held. Several witnesses testified that deceased held respondent in high esteem, referred to her as "daughter," and on several occasions said that all she had should go to the respondent. It was uncontroverted that respondent rendered deceased many services such as driving her about, inviting her to dinner, and helping her while sick, and with her business. Several witnesses, relatives of respondent, testified that, on one occasion, deceased mentioned an agreement to the effect

that, if respondent continued to perform her part, everything would go to her. On the other hand, there was evidence that, in a conversation with her attorney, the deceased said that the property might as well go to her relatives, the appellants herein. There was conflicting testimony as to the affection between deceased and the appellants.

In deciding for the appellants the court relied upon the rule that the evidence must be conclusive, definite, and beyond all legitimate controversy, and pointed out that from the evidence the trial court could not determine the terms of the contract with any degree of definiteness.

*In re Swartwood & Welsher Estates,* 198 Wash. 557, 89 P. (2d) 203. It was alleged by the ancillary administrator of the Swartwood and Welsher estates that he had entered into an oral contract with James Coonan, deceased, who had promised to give him certain property for favors and care during his old age. At the time Coonan died, the administrator, here, was appointed administrator for his estate, and the property passed to Coonan's sister, Swartwood, who in turn died, and the property passed to the surviving sister, Welsher, who also died. Webb, the claimant, was appointed ancillary administrator in both of the sisters' estates. His first claim to the property rested upon the alleged oral contract with Coonan. It appeared that Coonan had from time to time said that the property would be left to Webb, and that Mrs. Webb took care of him. Mrs. Webb, however, said that this was simply a kindness to the old man. The court held the alleged contract unenforcible.

*Thompson v. Weimer,* 1 Wn. (2d) 145, 95 P. (2d) 772. Action against executor for the specific performance of an alleged oral contract between respondent and deceased made while deceased was visiting respondent in California. It was contended that, in return for moving from California to Tacoma and establishing a home for the deceased, the deceased promised to leave the bulk of his property to the respondent and his wife. Proof of the contract was largely confined to the circumstances and statements made by the deceased that the respondent would not have to worry, and that he and his wife would be well provided for in the

future. Shortly after the return of deceased from his visit in California, he executed a will devising less than half of his property to the respondent. It appeared that the move from California was to the mutual advantage of both parties, since respondent had suffered financial reverses, and the deceased lived with respondent and his wife and was tended by the wife, who was a nurse. A month before his death, deceased executed his last will while visiting the chief beneficiaries of that will. The court stated that there might be some ground to prove undue influence, but that there was no proof of an oral agreement to devise and bequeath the bulk of the property. In fact, the first will was inconsistent with any such proposition because respondent was to receive less than half under its provisions. With respect to the rule of law, it was said:

"Equity, however, can grant relief in such a situation, but in a measure, equity follows the law, and, in the absence of a writing, will not grant relief unless the alleged oral contract be proven by 'evidence that is conclusive, definite, certain, and beyond all legitimate controversy.' "

The action in *Aho v. Ahola,* 4 Wn. (2d) 598, 104 P. (2d) 487, was for specific performance of an oral contract alleged to have been entered into between deceased and appellant, to the effect that, in return for room and board, deceased would leave his property to appellant. The pertinent testimony was from the son of the appellant, and that did not show how much property the deceased was to give or whether or not he was to reside with appellant until his death or for a period only. Deceased did make a will devising the property to the appellant, but this failed for want of statutory compliance. It was held, on the basis of the *Resor* case, *supra,* that the evidence fell far short of the requirements of being "conclusive, definite, certain, and beyond all legitimate controversy."

*Allen v. Dillard,* 15 Wn. (2d) 35, 129 P. (2d) 813. It was alleged by appellant, in substance, that by an agreement the brother promised to devise and bequeath a portion of his property to the aunt in exchange for the aunt's devising and bequeathing all of her property to the appellant. Ap-

pellant's brother died leaving his property in conformity to the alleged contract, and the aunt changed her will. The court said that specific performance would lie where one of the parties had died, thus fixing the rights of the parties, and where there was "clear and convincing" evidence to establish the contract. The evidence in the instant case, however, was not sufficient, since the only witness of any importance could only testify to self-serving declarations of the appellant's brother, which were not admissible.

*Dau v. Pence,* 16 Wn. (2d) 368, 133 P. (2d) 523. Respondent contended that he and the deceased had agreed that, in consideration for his taking care of her, she would leave him her property on her death. The evidence in support of the alleged contract was largely testimony of witnesses as to expressions by the deceased that the respondent was to get all she had, that she wanted him to have everything upon her death, and similar statements. This court, in reversing the judgment of the trial court, held that the evidence did not prove the contract.

*Widman v. Maurer,* 19 Wn. (2d) 28, 141 P. (2d) 135. Respondents were six, and appellants four, of the deceased's children. Respondents contended that, upon the death of their father, all of the children entered into an agreement with their mother to the effect that, in exchange for their quitclaiming to her any interest which they might have in the father's estate, she promised to devise and bequeath all of her property to them equally. She did this, but several years later executed another will which gave one of her sons an option to purchase the home land, with the proceeds to be divided equally among the children. Proof of the oral contract was sought to be established by various meetings which the children and the mother had shortly after the death of the father. The conversations were partially in German and Swiss eighteen years prior to the trial, most of the witnesses were vague, and all were agreed that no contract was made when all of the children were present. Three of the witnesses were appellants and so testified against their own interest when they said that no agreement had been made. The family attorney had not

heard of any agreement. The court held that the evidence preponderated in favor of the view that no contract had been executed.

*Payn v. Hoge,* 21 Wn. (2d) 32, 149 P. (2d) 939. Action for specific performance of an alleged contract whereby appellants promised to maintain a home for the wife's stepfather, the respondent, in return for which he promised to let them use the house, rent free, and to devise it to them upon his death. At the time of the death of respondent's wife, in 1938, a family conference was held, and it was agreed that appellants should move into respondent's house. This was done, a room was set aside for the respondent, and although he was away a good deal of the time, he made his home there and made a will devising the property to appellants. The appellants testified that respondent had said that appellants were to have the house upon his death, that it was their home as long as he had a room there, and had made other similar announcements. The respondent, on the other hand, stated that, although he had said the place was to be his daughter's many times, and had drawn a will in her favor, it was only because she was the natural recipient of his bounty, and not because of any agreement which they had had. It appeared that disaffection arose at the time that respondent remarried, and that shortly thereafter the parties entered negotiations for the purchase of the property by the appellants. The opinion pointed out that both parties to the alleged contract appeared in court, so that the quantum of proof of the contract was only the establishment of its existence and terms "by evidence that is clear, cogent, and convincing to the trier of fact." Since the actions of the parties were a natural result of their relationship and of mutual advantage, and because there was no proof of any agreement, the court affirmed the judgment of the trial court.

*Whiting v. Armstrong,* 23 Wn. (2d) 290, 160 P. (2d) 1014. In this case, the plaintiff, as administrator of the estate of a deceased person, brought an action to recover certain real property. The evidence showed that the defendants, who were appellants in this court, married in 1939, and moved

into the upstairs apartment of property owned by the deceased, who lived in a downstairs flat. The rent was paid, but it was contended that in 1941 the deceased agreed to leave them the property in return for personal services such as furnishing meals, cleaning, and laundering. There was ample evidence that the deceased had said on numerous occasions that he was going to leave the property to the appellants. This court quoted the rule contained in *Widman v. Maurer, supra,* and held that the trial court was fully justified in finding that appellants had not supplied the positive and convincing proof required to establish the terms of the contract.

*Blodgett v. Lowe,* 24 Wn. (2d) 931, 167 P. (2d) 997, is the most recent pronouncement of this court upon the subject, and parallels the factual situation presented here. The action in that case was brought for the specific performance of an alleged oral contract between deceased and appellant whereby appellant agreed to forbear filing a claim against the estate of deceased's husband and to live with and care for her while she lived, in return for the gift, at her death, of all her property. Testimony of several witnesses disclosed that at various times the deceased had made statements to the effect that, because appellant was so good to her, he wouldn't have to worry when she died, that she was taking care of him, that everything was to go to him, that she was going to repay him, and other declarations of a similar nature. It appeared that appellant had lived in deceased's home for the twenty-three years immediately preceding her death, had washed, ironed, scrubbed floors, and performed many other household duties during the period of his residence with her. In deciding that the action would not lie, this court pointed out very emphatically that there must be proof of an agreement before the evidence of consideration for the alleged contract is material. It was said:

"While we are of the opinion the services performed by appellant in and around the home of Mrs. Buroker might have afforded ample consideration for an agreement, how was it possible for the trial court to say that the services

performed by appellant were the services contemplated by the agreement until an agreement was shown to have been made?"

Nor did the manifest intention of the deceased to provide for appellant evidence an original agreement. The rule of *Resor v. Schaefer, supra,* was quoted with approval.

It will be noted that, in all but four of the first class of cases which we have cited, the proof of making a contract to convey or devise property was supported by written instruments, which, though not conclusive, did furnish that quantum of evidence necessary to comply with the rule relative to proof of alleged oral contracts.

In the *Velikanje* case, the evidence produced to support the contract left no doubt whatever that a contract had been made and had been performed by the plaintiff.

In the *Avenetti* case, this court held that the contract need only to be proven by reasonable certainty. This is not sustaining authority, because of the fact that compliance with the accepted rule relative to the certainty of the evidence was not required.

In the *Resor* and *Luther* cases, *supra,* the evidence was definite, certain, and sufficient to sustain the making of the contract. In fact, the evidence there would have been sufficient to prove guilt in a criminal case.

The evidence to support alleged contracts in the second class of cases is like that in the case at bar. That evidence consisted for the main part of testimony of witnesses as to statements made by deceased that he expected to leave his property to another. Expressions, "——— has been good to me, and I will leave my property to him. When I die he will receive everything. If anything happens to me ——— will receive everything," do not prove the making of a contract, nor does it indicate any of the terms of a contract.

The alleged contract in the present case falls within the second class of cases, in which it has been held that the evidence was insufficient to prove the making and performance of an oral contract to devise property. The trial court did not conclude that the evidence was sufficient to meet the rule laid down in the *Resor* case. His statement made at the

conclusion of the trial, when he referred to the evidence, was as follows:

"It is only necessary that the plaintiff in this kind of a case establish his case with reasonable certainty. From all the evidence in the case I am satisfied that the plaintiff has met this burden."

The court erred in following the rule of the *Herren* and *Avenetti* cases instead of the rule definitely announced in all other cases dealing with the question of the degree of proof necessary to support an oral contract to devise property. The oral contract contended for by respondent was not sustained by evidence that was conclusive, definite, certain, and beyond all legitimate controversy.

The judgment is reversed and the case dismissed.

BEALS, C. J., MILLARD, STEINERT, BLAKE, ROBINSON, and JEFFERS, JJ., concur.

CONNELLY, J. (dissenting)—I dissent. In my opinion, the record discloses ample evidence to sustain the trial court's finding that the deceased, Tonjum, had entered into a verbal contract with respondent, Jennings, by the terms of which the latter was to receive Tonjum's real and personal property upon the contingency of Tonjum's death.

In the recent case of *Blodgett v. Lowe,* 24 Wn. (2d) 931, 938, 167 P. (2d) 997, this court laid down the rule of evidence with reference to the requirements for establishment of an oral contract to convey property after death. It is expressed in this language:

"In order to establish a contract such as here alleged to have been made, it is necessary that the person asserting it show, by evidence that is conclusive, definite, certain, and beyond legitimate controversy (1) that a contract as alleged was entered into between the deceased and the person asserting the contract; (2) that the services contemplated as consideration for such agreement have been actually performed; and (3) that such services were performed in reliance upon the agreement."

At what may be considered undue length, excerpts from the record, showing the testimony of various witnesses relating to the existence of an oral contract between Tonjum

and Jennings to convey the property of the former, upon his death, to the latter, are set forth.

Testimony of John H. Ellison:

"Later in November the same year, when I came back from Alaska, in the meantime Mr. Tonjum had been injured, and at that time he stated that Mr. Jennings wanted —or he wanted Mr. Jennings to have everything he had because he absolutely could not get along without him because he was under medical attention, he couldn't wait on himself and he couldn't take care of himself, and he would be unable to do the work on that place, the grubbing of the stumps and the upkeep of the place. Q. Who was present at the time when you returned from Alaska and you discussed it with Tonjum? A. Mr. Jennings was present. . . . Q. Now, what was said at that time? A. *At that time Mr. Tonjum told me that if Mr. Jennings would take care of his home, take care of the grounds, and wash his clothes, and take care of the property, and look after him while he was sick, that he wanted him to have everything that he owned, that he did not want his relatives to have anything. On the settlement of his father and mother's estate they got everything, and he did not want them to have anything. With what they had, he and Mr. Jennings had accumulated together, and for the welfare and the care that Mr. Jennings had given him through the years, he wanted him to have all of his property. He didn't state it once, but many times.* . . . Q. Was there anything said by Mr. Jennings at that time in response to the statements by Mr. Tonjum? A. *He said that he would look after him and take care of him like he had always done in all the years they had been together.* . . .

"Q. What was said at that time? A. *At that time I asked Mr. Jennings to go to Canada with me on a government —or on a job where he could make and clear himself a good sum of money, and Mr. Tonjum refused and Mr. Jennings refused. He said that he had given an agreement to Mr. Tonjum that he could not leave him, and Mr. Tonjum said he could not get along without George Jennings.* If he did leave he would not be able to hold down his job because his strength was not such that he could look after his home and hold down the job, *and that the home and all that he had was to be George's in case anything happened to him if he stayed and took care of him as he had in the past under their former arrangement.* Q. And did you see Mr. Tonjum

for any length of time then? A. I was in their home about two days at that time. . . .

"Q. You have mentioned two different times in which Mr. Tonjum had stated what his arrangement was with Mr. Jennings. Did he make statements concerning it at any other time? A. Many times during our acquaintance. Q. And what was the general substance of those statements? A. *For the care and the work that Mr. Jennings did in taking care of his home and taking care of Mr. Tonjum over those period of years, in case of Mr. Tonjum's death, Mr. Jennings was to have everything, the home and everything that Mr. Tonjum had, for his services.* Q. Were you at the home enough to know how Mr. Jennings performed those services for Mr. Tonjum? A. Yes, sir. Mr. McDonald: I object to that. I think it is a leading question. You asked him for a conclusion. Mr. Gere: Read the question. (Question read.) You may answer. The Court: Objection overruled. A. Yes. Q. How did he perform those services for Mr. Tonjum? A. The laundry was done under a handicap. He had no washing machine, just a small laundry tub, no built-in tub or no features whatever; only the very hardest, crudest way of doing laundry, that part of it. The home that he lived in had no bath. Mr. Tonjum had to be given a bath in an ordinary laundry tub. And part of the time water had to be heated on the stove, until they installed a hot-water tank. Q. Did Mr. Jennings do the work around the place? A. He did. He washed all clothes, washed all dishes. He did all the cooking. Mr. Tonjum could not cook. He did all the gardening. He took care of and raised chickens, sold eggs and sold chickens. The money from that went into the welfare of the home and for their food." (Italics mine.)

Testimony of George Cecil Vaughn:

"The Court: If he can't remember the exact words, he can state the substance. A. The words he said was, '*If Mr. Jennings cooks for me, takes care of me, does my housework and my washing and bathes me, when I die he will receive everything.*' Q. Did he talk more than once in regard to it? A. Yes, sir. Q. Was Mr. Jennings present at any time? A. Yes, sir. Q. Where did the conversation take place? A. That conversation took place in my house, and took place in their house when I was over there." (Italics mine.)

Testimony of Jessie Marie Vaughn:

"Mr. Gere: In regard to the conversation between you

and Mr. Tonjum, in regard to Mr. Jennings? A. He was so sick there for a time he used to think he was going to go. *He used to say if he did, for all the work that George had done for him and everything, he wanted him to have everything.* Q. Do you know about when that was the first you heard him say that? A. I would say it was around about the first of the year of 1936. Q. That was right after his injury? A. Right after he was sick." (Italics mine.)

Testimony of Thomas Morris Wilson:

"Q. Was there anything said about how long George was to work for him and what he was to receive for the work? A. *Shortly after he was hurt he really doubted he was going to live and he wanted George to take care of him at all times and if anything happened to him everything he had was George's anyway so it didn't make any difference.* Q. Do you know what his injury consisted of? A. Yes. He was kicked several times in that particular accident at the hospital, in front and side and everything before he could get on his feet and protect himself. Q. What was the effect upon his general health? A. He went down to nothing in a very short while." (Italics mine.)

Testimony of Glen Elmer Watkins:

"Q. (by Mr. Gere) Did you ever have any conversation with Mr. Tonjum? A. Yes, sir, whenever he was down we always saw him and talked, sometimes for three or four hours. Q. Did you ever have any conversation with him in regard to Mr. Jennings? A. No, not exactly. The closest we came to that was— MR. LIND: That is not responsive. MR. GERE: I think he has a right to explain what he meant. THE COURT: Yes, go ahead. MR. GERE: What were you going to say? A. John was paying on his place and I talked him into paying it all up. He only had a little bit left. He came down one evening and told us that he had received a deed. So we asked him, 'where are you keeping it, John?' MR. LIND: That is hearsay. THE COURT: No, an admission against interest. A. (continued) John says, 'I have a tin box that I keep it in.' My wife says, 'you ought to have a safe deposit box,' she says, 'my husband and I have one that we keep our papers in and a will in.' John says, 'What, you got a will?' and we told him and we even made out a will—well, he says, 'I never made out one,' or words to that effect. He says, 'One thing I don't want my folks to have any of my property.' Well, I says to him, 'You better make out a will then, John, or if you don't they will prob-

ably get it.' *He says, 'Well, I don't want them to have it'* *and he says, 'I guess I will have to make out a will then,'* *he says, 'I want to leave all my stuff to Jennings'—'George'* *as he called him.* And that was about the only conversation we ever had on that part of it." (Italics mine.)

Testimony of Clara Watkins:

"Q. Did you and Mr. Tonjum ever have any conversation relative to Mr. Jennings? A. Only when he told us that he wanted Mr. Jennings to have his estate. Q. When was that? A. Well, it was when he got the deed for his place, and he came down and told us that he had finished paying for his place and he had got the deed. So I asked him if he had got a place to keep his deed. He said he kept it in a tin box underneath his bed. I told him I didn't think that was such a good place, it would be destroyed or lost. I says, 'Why don't you get you a safe deposit box to keep your papers? That is what my husband and I have, a safety deposit box to keep our papers in, and we keep our wills in it. And he didn't seem to understand law forms and he says well, just as well go.' And he discussed a will with us and he says, 'Well, I will make out a will.' Q. Did he say anything further about it? A. Yes, the last he talked to us he said he was going to make out the will. Q. *Did he say to you whom he was going to will it? A. Yes, to George. When he discussed it with us he said he didn't want his relatives to have anything because he said, 'They never did anything for me here. He has taken care of me and all of my work, and he is the one to have my estate.'*" (Italics mine.)

Testimony of Jennie Partridge:

"Q. (By the court) What did he say, do you recall it? A. Yes, sir. Q. They were talking about an arrangement. What was it? A. I was talking about the time after he had been down to the Veterans' Bureau. THE COURT: Yes. A. And Mr. Tonjum said, 'Well, I guess I'm not much good. I am a pretty sick man.' Q. (By the court) Did he say anything more than that? A. Yes, he did say if I can tell you it. Q. (By the court) Just, 'I am not much good; I am a pretty sick man?' A. And he said, 'I guess I am not much good.' So then I suggested that why didn't he be hospitalized. Q. (By the court) That he should go to the hospital? A. Yes, they might be able to do something for him. Q. (By the court) Did he answer you about that? A. Yes, sir, he did. Q. (By the court) What did he say? A. He was resting in his bed at that time. Q. (By the court)

What did he say next, if anything? A. Yes, he did, sir. I am sorry. So I said 'Well,—' he said, *'No, I don't want to go to any hospital.' He says, 'George is giving me the finest of care.'* Q. *(By the court) George was giving him the finest of care?* A. *And he said, 'I am satisfied.'* Q. *(By the court) Was there anything further?* A. *And he said, 'Well,' he said, 'I don't need to worry about it. If anything happens to me,' he says, 'I will leave everything to George.'* " (Italics mine.)

All of the foregoing witnesses were present in court and under observation of the trial judge except Ellison, who testified by deposition, and whose entire testimony has the ring of sincerity and credibility despite vigorous and extended cross-examination. Summary of the facts by the trial judge in his memorandum opinion is as follows:

"The facts developed at the trial reveal a rather unusual situation. The plaintiff and the deceased were both veterans of the first World War and for about twenty-five years lived together most of the time and particularly since 1927. The plaintiff, a man past middle life, suffered a nervous breakdown in the early 20s and appeared to be an effeminate and somewhat neurotic individual. At least his conduct indicates that he had withdrawn from the battle of life and was content to occupy his time painting pictures and doing gardening and household work. The deceased was employed most of the time in question as an orderly in the City Hospital. The two men first had a rooming house on Cherry Street and lost it during the depression. After that the deceased bought a tract of land known as Lot 3, Block 4, Hallberg's ¼ acre tracts, 7314 32nd Avenue South, to which they moved in March of 1936. There was a very dilapidated house on this property. The plaintiff cleared the land, fixed up the house, and the parties lived there up to the time of decedent's death on August 14, 1944. His death occurred as the result of being struck by an automobile.

"On the 14th day of October, 1935 the deceased was kicked in the stomach by a patient in the City Hospital, where he was working, which resulted in serious injuries, and from that date until 1942 he was more or less bedridden. The plaintiff cared for him like a mother would a child. During part of the time he lost control of his functions, and the plaintiff nursed him, washing the bedclothes and cooking special diets. Outside of an occasional service

on a coroner's jury, the deceased was unable to earn any money.

"In the summer of 1936 the plaintiff received approximately $600 as his soldier's bonus, all of which he put in the place. He grew a vegetable garden, some of the products of which he sold, raised chickens, sold eggs, and did some odd jobs. All of the money of both men seems to have gone into this property and for their support.

"In 1942 the deceased had apparently made some improvement and went to work as a guard in an industrial plant, at which place he met his death as a result of the accident above mentioned.

"I do not believe that any useful purpose would be served by a more detailed statement of the facts in the case."

As stated in the majority opinion, "Each case of the kind now before us must rest upon its own peculiar facts and circumstances." With this rule in mind, it seems fair to suggest that the conduct and relationship of the parties, though not in itself proof of the existence of a contract, lends strong corroboration to the testimony of the witnesses who quoted Mr. Tonjum to the effect that he had entered into an agreement with Mr. Jennings. The two men were close personal friends. They had each seen service in the American army during World War I. They and Ellison had met at an American Legion hall shortly after the end of that war. The friendship of Tonjum and Jennings was intimate and continued close through all of the intervening years to the date of Tonjum's death. During the years of Tonjum's illness and incapacity, Jennings cared for him as only a parent or brother would ordinarily care for another. He lived at the home, he operated the acre tract, he gave personal nursing and diet care to Tonjum through his sickness. When he received his bonus, Jennings expended it all in repairing the home and the tract of land upon which the two lived.

Factually and circumstantially, the record reveals the strongest reasons for Tonjum to make the contract which Jennings claimed he had made and which the witnesses credited Tonjum with stating he had made. That no formal written document was entered into is readily understand-

able. There is nothing in the record to indicate that these men were of the educated class or that they were versed in legal knowledge.

The fact, as pointed out in the majority opinion, that this court has passed upon thirty-seven cases involving the question of proof of an oral contract to devise property upon death, is strong indication that the average person who enters into such an oral contract is neither a ritualist in adherence to legal form nor a perfectionist in the choice of language used to express the terms of the agreement. It is for this reason that this court, and the courts of most of the other states, recognize the equitable doctrine that oral contracts to make a will or to devise property upon death have standing in the law.

It should likewise be observed that some persons purposely refrain from executing a will to devise their property where conditions of performance, such as care of the sick, maintenance of farm work, and so forth, are a part of the agreement. This is one means of insuring performance of the condition.

Granted the rule, stated by the majority, that cases of this kind are not favored when the promise rests in parol. Granted likewise the rule, stated by the majority, that the burden of proof is upon the proponent of the contract to prove it by evidence that is conclusive, definite, certain, and beyond all legitimate controversy, as was stated in *Resor v. Schaefer*, 193 Wash. 91, 74 P. (2d) 917. It should be noted that further perusal of the opinion in that case indicates that it presents a striking parallel to the situation presented in the instant case.

"The contract made by Mr. Draper was not, under the existing circumstances, an unnatural one. He was old and infirm, with not many years, at most, to live. He had no children, nor did he have any relatives close by. He preferred his own home to a life among strangers or in a hospital. But, being almost blind and afflicted with diabetes and Bright's disease, manifestly he was unable to keep up his home or live there unattended. Respondents were his friends and were willing to give him the care and attention that he needed and desired. That they did fully minister

to his wants and comforts in full compliance with the alleged agreement, *is beyond any question.*

"The terms of the contract, as testified to by the single witness, are in no sense vague, indefinite, or uncertain. They express in detail just what respondents were to do and what Mr. Draper was to do in return. If it were conceded that the contract was in fact made, there could be no doubt that it would be enforceable. The only question is whether the one witness told the truth when he testified as he did. On that score, the record before us carries its conviction. The trial judge, in his memorandum opinion, first stated the rule, above quoted, by which he was controlled, and then expressed himself to the effect that he believed that the witness was telling the truth. The trial court was, therefore, fully convinced that the evidence met the requirements of the rule, and we find no good reason for differing from that conclusion." (Italics mine.)

In the present case, in finding for respondent, the trial judge used the following language:

"It is only necessary that the plaintiff in this kind of a case establish his case with reasonable certainty."

On its face, this is a departure from the rule, as defined in our later cases, that an oral promise to make a will or an oral contract to devise or bequeath property must be established by evidence that is conclusive, definite, certain and beyond all legitimate controversy. *Blodgett v. Lowe,* 24 Wn. (2d) 931, 167 P. (2d) 997; *Resor v. Schaefer, supra.* Concededly, this language of the trial court is loosely expressed, but a careful reading of the testimony of the several witnesses, pertinent excerpts from which have been set forth herein, renders it clear that the requirements of the correct rule are fully met, and that the trial judge had the true rule in mind when he reached a decision which upheld the establishment of the oral contract to devise. The trial judge was convinced, from that testimony and from the circumstances constituting the background and relationship of the parties, Tonjum and Jennings, that a contract did exist, and the witnesses' testimony going directly to the statements of Tonjum relating to the agreement, the testimony showing the performance by Jennings of the conditions constituting his part of the con-

tract, and the testimony showing the intimate relationship over a period of years of the two parties, together with the circumstances constituting the background of their lives, certainly measures up to the requirement, expressed in the *Resor* case, *supra,* that such evidence must be conclusive, definite, certain, and beyond all legitimate controversy. Our duty is to measure the evidence by the true rule as it has been laid down by this court, not to seek technical error in the somewhat inapt language of the trial court.

In his memorandum opinion, the trial judge refers to *Velikanje v. Dickman,* 98 Wash. 584, 168 Pac. 465; *In re Krause's Estate,* 173 Wash. 1, 21 P. (2d) 268; *In re Fisher's Estate,* 196 Wash. 41, 81 P. (2d) 836; *Luther v. National Bank of Commerce,* 2 Wn. (2d) 470, 98 P. (2d) 667.

In the *Velikanje* case, *supra,* Judge Ellis said:

"The evidence of the existence of the exact agreement claimed was as clear and convincing as could ever be adduced where, as here, the lips of both parties are sealed, those of the one by death, of the other by the law. The evidence was certain as to the parties, the property and the services to be rendered, but was not so certain as to how the title was to pass. This last is not an essential. A promise to leave property in return for support or services need not specify how title is to pass. It is sufficient if an agreement is shown that the promisee shall receive the property, or that it shall be left to him at the decease of the promisor."

In *Luther v. National Bank of Commerce, supra,* Judge Steinert stated:

"It is well settled in this state that oral contracts to devise and bequeath real and personal property are enforceable if they are established by evidence that is conclusive, definite, and beyond all legitimate controversy, and if there has been sufficient performance to remove the bar of the statute of frauds. See *In re Fisher's Estate,* 196 Wash. 41, 81 P. (2d) 836, and *Osterhout v. Peterson,* 198 Wash. 166, 87 P. (2d) 987, where the cases are assembled and discussed."

It can only be assumed that the trial judge, despite the looseness of his reference to the rule, was wholly familiar with its requirements, as expressed by this court. In any

event, as stated, the evidence measures up to the strict requirements of the rule. It is clear, cogent, and convincing. It is beyond controversy. The witnesses who so testified, with one exception, were before the trial court, and their credibility, manner, and demeanor while testifying were for the trial judge to appraise. The deposition testimony of the witness Ellison was undoubtedly considered by the trial court in the light of the testimony of the six witnesses who did appear in court and who each corroborated the testimony of Ellison with reference to the statements of the deceased, Tonjum. It all dovetails. There is no conflict. The trial court was, therefore, in an excellent position to pass upon the credibility of the several witnesses, including Ellison, all of whom quoted Mr. Tonjum as stating that he had made an agreement with Mr. Jennings to leave all of his property to the latter in consideration of the care and nursing which he was performing for Mr. Tonjum, and the care, work, and maintenance which he was devoting to the acre tract upon which they made their home. At least, the trial judge could accept and believe with better grace the testimony of the witnesses, whom he had observed, than we, who have never seen them, can reject it. He believed them and declared the contract proven by their testimony, and likewise declared its terms to have been performed by the respondent Jennings.

A careful reading of the record, and our prior decisions upon the point, disclose no reason for disturbing his finding. I am, therefore, of the opinion that the judgment of the trial court should be affirmed.

MALLERY, J., concurs with CONNELLY, J.